## Commonwealth v. Murray

*Gerald L. Bowen*, for Commonwealth.

*Louis D. Apothaker*, for private prosecutor.

*Nathan L. Posner*, for defendant.

SLOANE, P. J. and LEFEVER, J., April 8, 1965.—
Defendant, John Murray, was tried and convicted by
Judge Lefever, sitting without a jury, upon the charges
of offering to bribe and bribing a corporate employe in
violation of the Act of June 24, 1939, P. L. 872, sec.
667, 18 PS §4667.

In support of his motions for new trial and arrest of
judgment, defendant contends (1) that the verdict was
against the weight of the evidence; (2) that the
detective's testimony was inadmissible because it was
obtained in violation of the Pennsylvania anti-wire-
tapping statute: Act of July 16, 1957, P. L. 956, sec. 1,
15 PS §2443; (3) that this court lacks jurisdiction to
try the offense of "offer to bribe" since defendant was
outside Philadelphia County at the time he made the
alleged offer; and (4) that the Commonwealth failed to
make out a prima facie case because it did not prove
lack of knowledge and consent by the injured corpora-
tion as required by the statute.

Defendant, John Murray, was employed as superin-
tendent by Lanston Monotype, Inc., Philadelphia (here-
inafter referred to as "Lanston") for several years. At
the end of 1962 the president of Lanston resigned to
return to Summit Industries in Aspers, Adams County,
Pa. (hereinafter referred to as "Summit") ; he is now
president and chairman of the board of Summit. On
February, 1963, defendant resigned as superintendent
of Lanston to become general manager of Summit.

Donald C. Haas, who was employed by Lanston as a
maintenance man and a worker in the shipping depart-
ment, was the employe allegedly bribed by defendant.
A summary of his testimony follows:

On Friday morning, May 10, 1963, Marianne Murray, daughter of defendant and also an employe of Lanston, handed Haas a note from defendant. This note requested Haas to telephone defendant, collect, at the Summit plant, Biglersville 677-8448. Haas telephoned defendant, collect, from an outside phone booth. Haas heard the man who answered the telephone say: "Hey, John, there is a telephone call here for you collect from Philadelphia from Donald Haas." Haas heard the defendant reply: "I'll take that." Defendant addressed Haas: "Hiya Buddy . . . I want you to do me a favor, Donald . . . I want you to see if you can get me some prints . . . [of] the perforating machine in the paper department . . . [which are located] on the table by Alek Carroll . . . There is $25. in it for you if you do me the favor." Haas promised to see what he could do about the matter.

Haas then went to the specified table in the paper department and located the prints. On the following Monday, Haas told first his union shop steward and later Alfred Warner, superintendent of Lanston, of the bribe offered by defendant. On instructions from Warner, Haas went to the office of Joseph McGlynn, Esquire, Two Penn Center Building, Philadelphia. There he met Harry J. Morris, an investigator of E. J. Charters Associates, private detectives. Later Warner came in, bringing with him the blue prints which defendant had asked Haas to obtain. Warner turned them over to Haas and the latter took them to his home.

On the following day, Haas met Morris in the office of E. J. Charters Associates in the Packard Building, Philadelphia. The two of them sat in the same office a few feet apart with telephones in front of them. Morris then placed a person to person, collect, telephone call in Haas's name for defendant at the Summit plant.

When defendant answered, Haas conversed with him through the telephone on the desk before him and

Morris listened on the extension 'phone over which he had placed the call. Haas told defendant that he had obtained the prints and that he would deliver them to defendant at his home, 612 McClellan Street, Philadelphia, the "house with the green awnings," at eight o'clock Wednesday night. Defendant at first suggested that he send an accomplice to pick them up, but Haas insisted that the defendant come to his home in person. Defendant agreed.

Defendant and Ed Rohlfing arrived at Haas's home on Wednesday, at 6 p.m. rather than at 8 p.m. Haas delivered the prints of the perforating machine to defendant in the living room of his home and defendant "pulled out a black leather wallet and he handed me a twenty dollar bill and a five dollar bill." These bills were initialed by Haas, immediately after defendant left, and later turned over by him to Morris. The bills were identified by Haas at the trial and admitted into evidence.

Mrs. Haas corroborated her husband's testimony as to defendant's visit, his delivery of the prints to defendant and defendant's paying him for them.

Morris testified that a wire tap had been attached to the switchboard in his office prior to the call and that a tape recording was made of the conversation. This tape was offered in evidence; but defendant's objection to its admission was sustained. However, over defendant's objection, Morris was permitted to testify as to the conversation he heard between Haas and defendant. His testimony as to this substantially corroborated Haas.

Defendant took the witness stand and categorically denied the offer of bribery, the receipt of the blue prints and the payment of $25. therefor to Haas. Defendant testified that his automobile, while in the possession of a friend, broke down in Philadelphia; that the Philadelphia Police threatened to tow it off the

street unless he removed it; that he and Rohlfing drove to Philadelphia in another automobile to check the condition of defendant's parked automobile, to make arrangements for its repair and removal from the streets and also to check into the condition of Rohlfing's automobile which had broken down on the turnpike a week before; that while defendant was in Philadelphia he decided to visit Haas and endeavor to persuade him to stop telephoning him about a job with Summit; and that he visited Haas at his home and talked to him only about this.

On cross-examination defendant admitted that he had never fraternized with any of his employes while he was superintendent of Lanston and that he had never before visited the home of Haas or any other Lanston employe. Moreover, he admitted that he had instructed his daughter to tell Haas to call him *collect* at the Summit plant and to give him Summit's telephone number for that purpose. His testimony on cross-examination was inconsistent with his defense. Rohlfing's testimony was equally unconvincing.

Defendant called a number of character witnesses who extolled his good character and reputation.

We have carefully reviewed the entire record in this case. There is not the slightest doubt in our minds that defendant offered Haas $25 for the blue prints; that defendant made a special trip to Philadelphia to obtain them; that defendant called at Haas's home and Haas there delivered the prints to him; and that defendant paid him $25 for the prints. In short, both the trial judge and the court en banc believe the testimony of Haas and disbelieve the testimony of defendant.

The testimony of Morris is merely corroborative. Hence, even assuming arguendo that his testimony were "tainted," as defendant urges, there is clear, positive, sufficient additional evidence in the record to

support the trial judge's findings of fact and conviction of defendant.

As stated at the outset, defendant has raised a number of technical defenses to exculpate him from his improper conduct. We shall consider them seriatim.

1. *A telephone extension does not constitute a wire tap.*

The Act of July 16, 1957, P. L. 956, sec. 1, 15 PS §2443, provides:

"No person shall intercept a communication by telephone or telegraph without permission of the parties to such communication. No person shall install or employ any device for overhearing or recording communications passing through a telephone or telegraph line with intent to intercept a communication in violation of this act. No person shall divulge or use the contents or purport of a communication intercepted in violation of this act. . . . no evidence obtained as a result of an unlawful interception shall be admissible in any such proceeding."

Defendant contends that the use by detective Morris of the extension telephone to overhear the conversation between defendant and Haas was a wire tap and that since defendant did not consent to Morris' use of the extension, the latter's testimony was inadmissible under the statute.

Admissibility of evidence obtained by wire tap is a highly controversial subject. It has been much debated in legal journals, bar association meetings, legislative halls, and elsewhere. A number of States have adopted legislation limiting or prohibiting it. However, wire tap has a common, well-known meaning, which is obvious from the term itself, i.e., interception of a telephone conversation or a telegraphic message by means of an external device or machine, frequently designated a "bug."

In our opinion this was never intended to apply to the ordinary regularly-installed telephone extension. In

America today, there are millions of such telephone extensions. It is commonplace for the ordinary home owner to have several telephone extensions in his home, e.g., one in the hall, another in the bedroom, a third in the kitchen, and a fourth in his office or den. Likewise, most business offices have multiple extensions operated through switchboards or button control. These extensions make it possible, normal and usual for two or more persons to pick up their telephones and participate in, or listen to, the conversation. If defendant's contention is correct that a person who picks up one of these extension telephones, without the permission of the party on the other end of the line, is guilty of a crime, thousands of Pennsylvania citizens daily commit this crime.

It is commonplace for a business or professional man to direct his secretary to pick up the receiver on an extension line and to make stenographic notes or a verbatim transcription of a telephone conversation, particularly when an important contract or other business transaction is involved. This is frequently a routine matter of making a record for file purposes. To constitute such commonplace, customary, routine business practice a criminal offense, the statute must expressly and clearly so specify.[1] Thus the problem is one of interpreting the statute in such a way as to both effectuate the legislative purpose and to do a minimum

---

[1] There is a requirement that crimes be defined with definiteness so that the citizens have notice: Winters v. New York, 333 U. S. 507; Nash v. United States, 229 U. S. 373. In Rathbun v. United States, 355 U. S. 107, it was held that listening in on an extension did not constitute a violation of §605, the Federal wiretapping prohibition. The court said, at pages 110 and 111: "The conduct of the party would differ in no way if instead of repeating the message he held out his handset so that another could hear out of it. We see no distinction between that sort of action and permitting an outsider to use an extension telephone for the same purpose."

of violence to the statutory language. The instant case presents a situation in which there are several possible interpretations of the statute, two of which would render the detective's testimony admissible and one which might make it inadmissible.

The first interpretation is both intellectually honest and logical, namely, to read the first sentence, which prohibits interception of communications, as introductory rather than a sentence which penalizes a specific form of conduct. It follows that the essence of the offense of interception is spelled out by the second sentence which prohibits the installation of devices for overhearing and recording communications. Under this interpretation, the sole function of the initial sentence is to provide for the exception of "consent of both parties," viz., the recording of a conversation by a third person is permitted if both parties agree. Such an interpretation would admit the testimony of detective Morris as to what he heard on the extension, since an extension phone is presumably not a device installed "for overhearing or recording communications . . . with intent to intercept," but the tape would be inadmissible since it was obtained from the installation of a device for the purpose of recording conversations. In support of this interpretation, it is to be noted that both parties using the telephone as a means of communication always take the risk that either one of them may have an extension phone on which another individual is listening. Inasmuch as the extension phone is so common in the United States, such hypothesis is not unreasonable. This, of course, does not apply to the probable presence of a mechanical "bug."

If this interpretation be accepted the question arises whether Morris' testimony was rendered inadmissible because he refreshed his recollection from a re-run of the illicit tape. Defendant contends that the "fruit of the poisoned tree" doctrine is applicable and the detec-

tive's testimony is inadmissible by virtue of being tainted, such taint resulting from the detective's involvement in procuring the illegal tape and using it to refresh his recollection. This contention is without merit. In several cases in which "the poisoned tree doctrine" was invoked, there was a "but for" causal link between the illegal process and the subsequently excluded evidence.[2] Such is not the case here; the detective testified: "I did not need to refresh my memory by looking at the transcript of that tape to remember certain highlights of that conversation." Therefore, it appears that the detective's testimony was totally independent of the recording and presumably could have been made without his reference to the tape.

A second interpretation of the statute, making the detective's testimony admissible, develops from Commonwealth v. Bruno, 203 Pa. Superior Ct. 541, Cert. denied, 379 U. S. 965 (1965). In that case, the recipient of a telephone message recorded it by holding the receiver of the 'phone sufficiently close to a tape recorder to record the caller's voice. It was held that there had been no "interception" within the meaning of the statute. It follows that there was no interception of the message in the present case since the primary phone and extension were indistinguishable as the destination of the message.

---

[2] In Silverthorne Lumber Company v. United States, 251 U. S. 385, it was held that certain books and information, which were obtained by an unlawful search and seizure, could not be subsequently obtained by subpoena. Mr. Justice Holmes then limited this doctrine with the statement, at page 392: "Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." See also Wong Sun v. United States, 371 U. S. 471; Lopez v. United States, 373 U. S. 427; and Nardone v. United States, 308 U. S. 338.

The third interpretation of the statute could, as defendant suggests, prohibit the introduction into evidence of the detective's testimony. To reach this conclusion, however, the criminal act of interception would be entirely independent of the crime of installation of prohibited devices. Moreover, in support of the first approach suggested herein the crime of installation is inchoate without a concomitant intent to intercept. It follows that any interpretation of the statute which would make both interception and installation separate offenses is not strictly in keeping with the statutory language.

It is noteworthy that in the instant case, Morris did not "install or employ any device for overhearing the telephone conversation." He merely used the extension which had been routinely installed by the telephone company. Moreover, Morris did not "intercept a communication by telephone" between Haas and defendant. *Per contra*, Morris initiated the call on his extension. When defendant answered the call, Haas raised the receiver on his extension and conducted the conversation. If Morris' conduct in the instant case was criminal, every switchboard operator in Pennsylvania who places or answers a telephone call and then listens momentarily to the conversation between her employer or member of his office and the person on the other end of the line, without the specific consent of both parties, is guilty of a crime. This is so absurd that it could not possibly have been the intention of the legislature.

Finally, the language of the statute is not clear as to whether consent of *both* parties or only one party is essential to avoid the statute. There is much authority for the latter proposition, nothwithstanding the references made by defendant to the various drafts of the bill in the House and Senate, and the inferences he draws therefrom. We are not satisfied that failure to

obtain consent of both parties constitutes a violation of the statute.

For all of the foregoing reasons we hold that the conduct of Morris in listening on his extension to the telephone conversation between defendant and Haas did not constitute a violation of the statute. Hence, his testimony as to it was admissible. Therefore, the trial judge did not err in this respect.

## 2. *The Philadelphia Criminal Court has jurisdiction.*

Defendant contends that the alleged offer to bribe Haas was made in Adams County, where defendant spoke the words of offer into the telephone, and that consequently the crime was committed in Adams County and not in Philadelphia County, where the words were heard by Haas. Defendant argues, therefore, that this court does not have jurisdiction in this case. However, defendant does not contest the jurisdiction of this court to try the charge of bribery as distinguished from the charge of "offer to bribe."

If defendant's position is correct, the result is ridiculous. In short, where two acts which are almost inextricable, viz., the offer to bribe and the actual bribery, were performed in different counties, States or countries, the two offenses would have to be tried separately in courts of different jurisdictions. Thus, in the instant case, the indictment for bribery would be tried in Philadelphia County, but the indictment for offer to bribe would be tried in Adams County. The offer to bribe and the actual bribing are so closely intertwined that due process of law requires that they be tried by one court at the same time. As stated in 22 C. J. S. §134:

". . . a person beyond the limits of a sovereignty who puts in operation a force which produces a result constituting a crime within those limits is liable if jurisdiction can be obtained of his person."

In Commonwealth v. Taub, 187 Pa. Superior Ct. 440, it was held that where threats were made by long distance telephone, the crime was committed where the recipient was terrorized. In short, a State has jurisdiction to proscribe conduct occurring beyond its borders which has an effect within the State.[3]

In People v. Daly, 276 N. Y. S. 583, where defendant telephoned complainant in another jurisdiction, using vile language and threatening serious bodily harm, it was held that the court where complainant resided had jurisdiction to try defendant for this crime. The court, speaking per Mr. Justice Salomon, stated at page 585:

". . . in the case at bar, however, the appellant, through a medium selected by him, namely, the telephone, acted with a clear intent to have his voice reach the complainant at her home, and having succeeded in doing that which he intended, and having, in his talk over the telephone, included the threat made, to do the complainant bodily harm, such acts and conduct tended to a breach of the peace in violation of the section of the Penal Law above mentioned, and the court, having jurisdiction of crimes committed in the territory taking in complainant's residence, had jurisdiction to try the issue."

See also State of New Jersey v. Faunce, 91 N. J. L. 333.

Such a result is not unfair. Defendant having consciously chosen to create an unlawful situation in a

---

[3] In Strassheim v. Daily, 221 U. S. 280, 285, Mr. Justice Holmes stated: "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power." In United States v. Johnston, 227 F. 2d 745, 747 (C. C. A. 3rd) Judge Goodrich stated: "It is well established that one does not have to be physically present in a state to be guilty of a criminal offense there."

foreign jurisdiction should be triable in the latter jurisdiction.[4] In the cited cases, the threatening conduct was proscribed because it would affect a third person; the effect would clearly be felt within the jurisdiction in which the threat was communicated to the individual. In the instant case, the proscribed conduct, namely, the making of the offer of a bribe, would presumably have its effect in Philadelphia County. Therefore, this court has jurisdiction.

3. *The Corporation's Lack of Knowledge and Consent As An Element of the Offense.*

The Act of June 24, 1939, P. L. 872, sec. 667, 18 PS §4667, provides:

"Whoever *offers* or *gives* to any . . . employe . . . of another . . . directly or indirectly, any commission, money, property, or other valuable thing, *without the knowledge and consent of the . . . employer* . . . as an inducement, bribe or reward for doing or omitting to do any act . . . by such . . . employe . . . in relation to the affairs or business of . . . employer . . . is guilty of a misdemeanor . . ." (Italics supplied.)

Defendant contends that the Commonwealth has failed to make out a case by virtue of its failure to show that the actual bribe was without the consent and knowledge of the corporation, as required by the quoted Act. Although there appear to be no Pennsylvania cases in point, careful analysis would militate against defendant's contention.

The reasons for the legislature's inclusion of the nonconsent requirement are not too clear. A compar-

---

[4] Cf. Commonwealth ex rel. Sickler v. Yaukey, 11 D. & C. 2d 11, where the court interpreted a statute which prohibited anyone from "sending, delivering or uttering" a blackmail letter to permit prosecution in the county to which it was delivered, saying: ". . . if the writer used the mail as his agent for the delivery, he is responsible where the delivery was made." Id. at 14.

able Federal statute, "Offer to officer or other person," 18 U. S. C. A. §201,[5] contains no provision requiring the illicit offer or gift to be made without the knowledge and consent of the agent's employer; however, the Federal statute was drafted to cover but one situation —offers to Federal employes.[6] The Pennsylvania legislature apparently felt that penal sanction should only be applied in situations in which the employer had no knowledge and had not consented to a gift to his employe. Hence, the statute expressly exempts "tipping" and provides that "industry custom" is no defense.

To the extent that defendant is obliquely raising an entrapment issue in the instant case, he must also fail because (1) the doctrine of entrapment is applied exclusively in situations in which law enforcement officials are the parties doing the "trapping"[7] and (2) the corporate activities do not approach the conduct required by the Supreme Court to constitute entrapment.[8]

---

[5] §201 was subsequently amended; it reads differently today; see 18 U. S. C. A. §201 (Supp. 1963).

[6] In Lopez v. United States, 373 U. S. 427, the conviction of Lopez for attempting to bribe an Internal Revenue Agent in violation of 18 U. S. C. A. §201, was upheld. After Lopez had made one attempt at bribery the agent, carrying a wire recorder at the direction of the government, returned to see Lopez a second time. At the trial, the agent's testimony was corroborated by the wire recording. The government quite clearly had knowledge of the offer in this instance; however, §201 does not require that the illicit offer be without the knowledge and consent of the government.

[7] See Paulsen & Kadish, Criminal Law and Its Processes 900 (1962).

[8] In Sorrells v. United States, 287 U. S. 435, 442, it was stated that entrapment is established "when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." See Sherman v. United States, 356 U. S. 369.

Defendant makes much of the fact that Haas informed Warner, superintendent of Lanston, of defendant's offer to bribe and that Warner hired the detectives and facilitated the consummation of the transaction to the point of placing in Haas's hands the desired blueprints. It would seem, therefore, that Warner had knowledge of, and consented to, the delivery of the prints by Haas to defendant. If knowledge of the superintendent is knowledge of Lanston, this might be a defense to the charge of bribery. It is not clear, however, that Warner had this authority. Per contra, Lanston merely consented to Haas carrying out the delivery of the prints and receipt of the bribe. Haas did not keep the money and the corporation did not intend defendant to keep the prints. Therefore, it would appear that it did not consent to the transaction. In short, the corporation did not consent to the "giving," but only to the "method of apprehension." It is difficult to believe that the legislature intended corporate "consent" in such a situation to nullify or excuse the offense. However, the statute states, in essence, that to excuse a violation, an employer must have "knowledge of" *and* "consent to" the proposed transaction. Both elements are necessary. Formal consent by the corporation through action of its officers or board of directors to Warner to turn over the prints to Haas was not proved. Nor did it appear that he had express or implied authority to do so. Therefore, this is not a defense for defendant.

However, even assuming arguendo that the corporation consented to the delivery of the prints to defendant, Haas's employer did *not* have knowledge and did *not* consent to defendant's *offer* to bribe. In fact, defendant's *offer* to bribe was made when Haas, in compliance with the request contained in defendant's note, telephoned him. Lanston and its officers had no knowledge of this. Warner only learned of this offer *after* the

telephone call and offer had been made. Therefore, the corporation did not consent to the offer of bribe. It follows that defendant was guilty of the criminal act of *offering* to bribe Haas. This is sufficient to establish the crime charged: Commonwealth v. Yarmark 185 Pa. Superior Ct. 276, 282. There the court said:

"The evidence clearly supports defendant's conviction of the offense. There is abundant credible evidence that defendant offered to pay Thompson $25 . . . in return for Thompson's assistance in regaining possession of the automobile."

In fact, defendant's counsel in the instant case concedes this:

"But you can be convicted of the commission of this crime merely by the offer. You don't need the actual commission of the crime, sir. It is in two parts."

It follows that the trial judge did not err in finding defendant guilty of offering to bribe.

In conclusion, the facts appearing in this record clearly demonstrate that defendant was guilty of the criminal offense of offering to bribe Haas. Moreover, for the reasons set forth above, we hold that none of the technical objections raised by defendant constitutes a defense to his criminal conduct. Therefore, the trial judge properly found defendant guilty of the crime charged.

Accordingly, the motions for a new trial and for arrest of judgment are denied.