Commonwealth *v.* Murray, Appellant.

38

Argued April 22, 1966. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Nathan L. Posner,* with him *Norman Leibovitz, Arthur Packel,* and *Fox, Rothschild, O'Brien & Frankel,* for appellant.

*Gordon Gelfond,* Assistant District Attorney, with him *Joseph M. Smith,* Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE MUSMANNO, October 6, 1966:

This case has to do with wire tapping and telephone extension listening.

John Murray, the defendant, who had been employed by a Philadelphia firm, Lanston Monotype, Inc., left that firm to take a job with Summit Industries in Aspers, Adams County. One day Murray called Donald C. Haas, an employee of the Lanston firm, and asked him to obtain from Lanston some certain prints of a "perforating machine," for which Murray would pay Haas $25. Haas reported this conversation to his superiors and then the Lanston firm employed E. J. Charters Associates, private detectives, to entrap John Murray. The agency assigned four men to the job.

On May 14, 1963, the Charters Agency took Haas to its offices in the Packard Building in Philadelphia, where a wire tap was attached to the switchboard so that all calls coming through the switchboard could be heard and recorded at that point. The mechanical device having been tested and found to be in working order, one of the detective operatives, Harry J. Morris, called the defendant Murray in Adams County, and then, when the connection had been made, turned the call over to Haas who talked to Murray. Murray said to Haas that on the following day he would come to Haas's home to pick up the "prints" and pay him $25. He did so, and was later arrested and charged with offering to bribe and bribing a corporate employe in violation of the Act of June 24, 1939, P. L. 872, §667, 18 P.S. §4667.

At the trial before a judge without a jury, the detective Morris testified to having listened in on a telephone extension to the conversation between Haas and Murray. The Court found Murray guilty and he appealed to the Superior Court which affirmed the conviction. Murray petitioned for allocatur which we granted.

The defendant-appellant contends that the conviction cannot stand because of the Act of July 16, 1957, P. L. 956, §1, 15 P.S. §2443, which, inter alia, declares: "No person shall intercept a communication by telephone or telegraph without permission of the parties to such communication."

The Commonwealth contends that there was no "interception." It can only so contend by reading the record with glasses which either obliterate or distort the print. Eugene F. Hessel, sound engineer, testified that, on instructions from the detective agency, he attached a wire tap: "A. I was called in by Charters Associates to record a telephone conversation. *I hooked up the equipment in our usual manner with a device*

to the phone line and checked it out by calling the weather bureau, played back the weather report to make sure the machine was in good operating order, and then when the conversation, phone conversation began, I recorded it. Q. You recorded it? A. Yes, Sir. Q. Now, how did you physically connect the recording machine with the phone? A. *Well, in the office there, is a panel, a phone panel, and the machine is clipped on the panel.* Q. Now, were you there the entire time that this conversation was taken? A. Yes, sir. Q. What were you doing at the time that it was being recorded? A. *I watched the machine and monitored the conversation that was coming in on headphones.* Q. *Could you hear the conversation?* A. *Yes, sir.*"*

It is clear from the record that the telephone line was tapped at a point before the line reached Haas's telephone instrument.

The engineer testified further about the physical tap: "Q. When you remove that panel there are certain wires inside of that hooking up to each phone in the office. A. That is correct . . . Q. And what you did, was it not, was to take your device and hook it up to that wiring? A. That's correct."

The wire tapping so graphically described not only violated the Act of 1957, but it also constituted a trespass on the rights of private property. Hessel admitted he did not have the permission of the Bell Telephone Company to apply the wire tap: "Q. Did you have permission of the American Telephone and Telegraph Company to hook up to their wiring? A. I was engaged to do this. I don't know. Q. I am asking you a question. Did you have permission from the Bell Telephone Company or American Telephone and Telegraph Company to hook up to their wires? A. Did I personally have permission? Q. Yes, sir. A. No, sir."

* All emphasis throughout supplied.

We have seen that the Act of 1957 specifically states that there may be no interception "without permission of the parties to such communication." Who were the parties to the communication in this case? Donald Haas and John Murray. It is obvious that detective Morris had the consent of Haas to intercept his communication with Murray, but it is equally transparent he did not have the consent of Murray, the defendant. According to the specific wording of the Act, the detective had to have the approval of both parties, not only one, before he could straddle the telephone wires.

The Superior Court, the court below, and the Commonwealth have cited several federal cases in assumed support of their position that the consent of Murray was not necessary, but the federal cases on this point are not authoritative since the Congressional Act on communication interception differs vitally from the Pennsylvania statute. Section 605 of the Federal Communications Act of 1934, 48 Stat. 1103, 47 U.S.C. §605, declares, inter alia, that "no person not being authorized by the sender shall intercept any communication."

Thus, under the Congressional Act, the eavesdropper needs to have the consent of only one person to the telephone conversation, to justify his transom listening, but under the Pennsylvania law both parties must be aware of, and indicate approval, of the long ear intrusion. The lower court said: "The language of the statute is not clear as to whether consent of *both* parties or only one party is essential to avoid the statute . . . We are not satisfied that failure to obtain consent of both parties constitutes a violation of the statute." The lower court apparently is hard to satisfy in reading simple and unadorned English. The statute specifies that there may be no interception "without permission of the *parties* to such communication." Parties certainly means more than one. Moreover, the his-

tory of this legislation reinforces the inevitable conclusion that telephonic interloping is illegal unless the individuals at both ends of the conversation agree that what they say to one another may be made public. When the Pennsylvania Act passed the State Senate, the prohibition read: "No person shall intercept a communication by telephone or telegraph without permission of *one* of the parties." (Senate Bill No. 97, Printer's No. 21, 1957.) However, this restriction to the consent of only one party was decisively rejected in the House by a vote of 128 to 61. The bill was then amended to provide for the consent of all *parties* to the communication before the interception could be defended. (Legislative Journal, 1957, Vol. II, pp. 1679, 1729, 1730, 1804.)

The Commonwealth contends that, regardless of the physical wire tapping in this case, which cannot be considered in any light other than a flagrant violation of the Act, the conviction of Murray is sustainable because the detective Morris testified to what he had heard on the extension telephone and not what was recorded by the wire tapping device. This argument overshoots the record. A written transcript was made of the telephone conversation recorded by the intercepting device. Detective Morris read this transcript not once but three times. When he testified, was he testifying to what he heard on the telephone extension or what he had read in the transcript? If his testimony was predicated on what was contained in the transcript, that testimony would fall within the ban of the Act as certainly as would the transcript of the recording itself.

The lower court cited in support of the conviction the case of *Nardone v. U. S.*, 308 U. S. 338. That case, instead of functioning as a pillar to support the conviction, operates as a wrecker's ball to smash it loose from its foundations. The Court said in the *Nardone*

case that once it is shown that there has been an unlawful wire tapping, as was shown here, the accused has to be allowed the opportunity "to prove that a substantial portion of the case against him was a fruit of the poisonous tree." That is all the *Nardone* case established and, in fact, the Supreme Court reversed the conviction and sent the case back for retrial because Nardone had not been given the opportunity to show how much of the prosecution evidence was tainted. The Supreme Court very specifically referred to the wire tapping committed by government agents in that case as "illicit practices."

In the case before us the defendant did have the opportunity to show that the evidence presented by the detective was truly fruit of a poisonous tree. Indeed from the mouth of the detective himself, it was demonstrated that the evidentiary apple he was chewing had a mildewed core.

On January 29, 1964, detective Morris testified to the conversation he said he had heard on the telephone extension some eight months before. When he was asked whether, as he listened, he wrote down what he heard, he replied that he had not employed pencil and paper because it was not to be left to the memory to "remember on this date what was said." The recording of the conversation was to be done in another way. "We had it taped." This answer in itself could be enough to overturn the conviction because it demonstrates that the whole criminal prosecution, from its very tainted genesis, was to be based on the wire tapping and the recording taken from the wire tap.

The evidence, however, is even more devastating that the detective depended on the three-times read transcript of the wire tape recording rather than his memory of what he had heard singly on the telephone two-thirds of a year before. The investigations of all detectives, and particularly private detectives, are invari-

ably reduced to writing because they must make a report on what they have done to those who hired them. A report was made here and that report contained the whole transcript of the recording taken from the wire tap. Detective Morris testified: "Q. And it [the transcript of the wire taping] is contained in the report that you have rendered to your superior and your superior to the client that engaged you; is that correct? A. That is substantially correct. Q. Now, sir, you have a copy of that report with you? A. Yes, sir. Q. *And you have read that report today, have you not?* A. *Oh, yes.* Q. *And you read it yesterday, did you not?* A. *Yes, sir, I did.* Q. *And on prior occasions?* A. *Well, on one prior occasion.* Q. *And you have read in that report what was taken down supposedly from the recorder?* A. *Yes, sir."*

Thus detective Morris had read the transcript of the wire recording on the very day he was on the witness stand, as well as on two prior occasions. The curtain rises higher on this phase of the shadowy operation: "Q. Mr. Morris, you did read these reports on at least three occasions, did you not, the transcript? A. Yes, sir. Q. You worded it word for word, did you not? A. Yes, sir. I would say that. Q. And you read not only what you just testified as to what you recall, but other phases of this alleged conversation, did you not? A. Yes, sir . . . Q. In other words, when he said, 'We will be down tomorrow night,' that you got from the transcript, did you not, from the recording, the exact language? Isn't that correct? A. I am not sure at the moment whether he mentioned Wednesday night. Q. Tomorrow night. A. Yes. Q. *You got that from the transcript?* A. *Yes.* Q. *And other phraseologies that you quoted in your direct examination, that came from this recording; isn't that true, sir?* A. *Yes, sir."*

With this outright admission by Morris that he obtained incriminating evidence from the transcript of

the illegally installed wire tape recording, it is as clear as the Twelve Tables that the conviction in this case rests on stilts imbedded in quicksand.

The detective violated the Act not only by authorizing the installation of the wire tape, but by divulging the contents of the transcript of the wire-taped conversation. The Act specifies: "No person shall divulge or use the contents or purport of a communication intercepted in violation of this act." Nor was the detective excused from his infraction of the law because this divulgence occurred in a courtroom and during a judicial proceeding. The statute specifically proclaims that: "The term 'divulge' includes divulgence to a fellow employe or official in government or private enterprise or *in a judicial,* administrative, legislative or other *proceeding."*

Nothing could more dramatically depict the intense determination of the Legislature to wipe out the iniquities of wire tapping than this forthright utterance that any information obtained in this manner may not only, except under dire penalty, be communicated to a fellow government or civilian employee, but it may also not even be used in a judicial proceeding. The General Assembly of 1957 outlawed wire tapping and all its trappings, results and effects, as completely as the Declaration of Independence wiped out monarchical tyranny in America.

We will now consider another phase of this appeal. Both the lower court and the Superior Court stated in their respective opinions, and the Commonwealth equally contends, that there is nothing illegal about someone listening in on a telephone extension, without the consent of the parties conversing on that wire, and then divulging the contents of that conversation to others. This position demonstrates another misreading of the Act. The Act declares in a no-nonsense fashion that "No person shall install or employ any device for over-

hearing, or recording communications passing through a telephone or telegraph line with intent to intercept a communication in violation of this act."

What is a telephone extension but a device for overhearing? The physical properties needed and the labor required to install a telephone extension may be even more extensive than those employed in attaching a wire tap, which is a gadget of sorts. They both lead from the main telephone line, they both lead to the same end result—eavesdropping. Thus, the difference which the Commonwealth, the Superior Court and the court below attempt to draw between a wire tap and a telephone extension cannot be based on any distinction in mechanical complexity between the two operations.

What the prosecution throughout this entire case fails to perceive is that the Act of 1957 has one precise purpose and that is to punish those who intercept telephone communications *without the consent of both parties*. The Act states that any person who intercepts a telephone communication by means of a mechanical device, or "aids, abets or procures a violation of this act is guilty of a misdemeanor, and shall be punishable by imprisonment of not more than one year, or by fine of not more than five thousand dollars . . ., or both." It can be wondered why the court below, when it heard detective Morris testify that he had aided and abetted in violation of proclaimed law, did not resolve itself into a committing magistrate and hold Morris for action of the grand jury.

Certainly the Commonwealth would not argue that if an interloper clandestinely installed a telephone extension to a private telephone and listened in on all conversations, he would be free from prosecution. Why would that situation change because the interloper happened to be a paid detective? He, the same as anyone else, must have the consent of both parties to a telephone conversation before he may, under the Act, listen into, and thus intercept, that conversation.

The purpose of a telephone extension is to accommodate the subscriber in his legitimate business or to add to his domestic comfort. The business and professional man has a telephone extension so his secretary may answer the telephone and inform him when he is wanted. The well-to-do householder has a telephone extension so that, when he calls his family, more than one of his loved ones may revel in the warmth and cheeriness of his greetings, share in the joy of his gladsome tidings, or obtain the directions which the master conveys. But this does not say that, because a telephone extension has been installed in the business office or in the home, a stranger may listen in, or that a detective may snoop, or that a blackmailer may legally obtain the secrets which will enable him to ply his nefarious trade. The Commonwealth seems to be of the impression that because a telephone extension is more or less permanent and a wire tap is an ad hoc procedure, the former can be used illegitimately. If it entertains that idea, it cannot point to anything in the Act of 1957 which gives that notion substance, approbation or even encouragement.

The Commonwealth cites *Rathbun v. United States,* 355 U. S. 107, and quotes from it in averred illustration of its position that there is nothing illegal about listening in on a telephone extension. The *Rathbun* case cannot possibly be binding on the Pennsylvania courts because, as has been said, the federal statute on the subject of wire tapping requires the consent of *only one* of the communicants in order to render evidence obtained from wire-tapping evidence admissible. The Pennsylvania statute demands the approval of *all parties* involved in the telephone conversation. The very first paragraph in the *Rathbun* opinion reads: "This case concerns the issue of whether the contents of a communication overheard on a regularly used telephone extension *with the consent of one party* to the conversa-

tion are admissible in federal court." Thus, the phrase "one party" is emphasized, but in the Pennsylvania statute, and we must repeat, we have the specific language: "No person shall intercept a communication by telephone or telegraph *without permission of the* PARTIES *to such communication.*" Parties obviously means all persons involved. Here the parties were Murray and Haas. Haas gave his consent but Murray did not. Thus, the *Rathbun* case has no more application to the situation at bar than it would have to the Pennsylvania Vehicle Code.

The installation or use of a telephone extension already installed, in order to intercept a communication, which the intruder has no right to hear, is illegal. It is against the law. All the prattle about the universality of the telephone extension is utterly irrelevant to this case. The lower court said: "It is commonplace for the ordinary home owner to have several telephone extensions in his home, e.g., one in the hall, another in the bedroom, a third in the kitchen, and a fourth in his office or den."

It is not known in what affluent neighborhood the lower court lives that the homes of all its friends are equipped with a vast, multiple-telephone system more appropriate to a fire engine station than to the "ordinary" private dwelling. The "ordinary" homeowners that the writer of this opinion visits usually have one telephone in the hall or the living room, and that is it.

However, even assuming that the home of the trial judge has ten telephone extensions, is this an invitation for ten neighbors to come in and eavesdrop on his private conversations? And then, the commonplaceness of any device or object is not the criterion for determining the innocence or criminality of its employment. No object can be more commonplace than a kitchen knife, but when it is used to stab someone to death, the ordinariness of the knife does not render it

any less a homicidal weapon. It is not what the telephone extension *is* that may make it illegal in certain circumstances, but the *use* to which it is put. The universally lauded Judge LEARNED HAND defined an interceptor as anyone who "intercepts a message to whose intervention as a listener the communicants do not consent; the means he employs can have no importance; *it is the breach of privacy that counts."* (*United States v. Polakoff,* 112 F. 2d 888, 889, 2d Cir. 1940). Breach of privacy is the issue in this case.

An extension telephone is not like a seashell that anyone may pick up and listen to. It is not like a wishing well into which anyone may shout. It is not like a deep chasm into which one may cast a stone and then listen for the echo. An extension telephone is just as private to its subscriber as his own tooth brush. No one has the right to listen in on his conversation on his telephone extension without his authorization. Apart from natural law which makes the robbery of one's words or ideas as much a crime as purloining his money or jewels, the Pennsylvania Legislature has declared such verbal thievery to be an act punishable in the criminal courts of the Commonwealth.

Listening in on a telephone extension, without authorization, on a person's private telephone conversation, is just as morally reprehensible, as well as legally improper, as tapping his telephone wire. It is all part of what OLIVER WENDELL HOLMES, illustrious jurist and renowned patriot, designated as "dirty business." Eavesdropping which amounts to trespassing is an invasion of privacy protected by the organic law of the land.

Section 1 of the Pennsylvania Constitution declares: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and

liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." One of the pursuits of happiness is privacy. The right of privacy is as much property of the individual as the land to which he holds title and the clothing he wears on his back. Justice BRANDEIS in his dissenting opinion in the case of *Olmstead v. United States,* 277 U. S. 438, said that the invasion of privacy by telephone is even greater than that involved in tampering with the United States mails: "Whenever a telephone line is tapped, the privacy of the persons at both ends of the line is invaded and all conversations between them upon any subject, and although proper, confidential and privileged, may be overheard. Moreover, the tapping of one man's telephone line involves the tapping of the telephone of every other person whom he may call or who may call him. As a means of espionage, writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared with wire-tapping."

The greatest joy that can be experienced by mortal man is to feel himself master of his fate,—this in small as well as in big things. Of all the precious privileges and prerogatives in the crown of happiness which every American citizen has the right to wear, none shines with greater luster and imparts more innate satisfaction and soulful contentment to the wearer than the golden, diamond-studded right to be let alone. Everything else in comparison is dross and sawdust.

Section 8 of Article I of the Pennsylvania Constitution and the Fourth Amendment to the Constitution of the United States are dedicated to this right to be let alone. But if detectives and private intermeddlers may, without legal responsibility, peer through keyholes, eavesdrop at the table, listen at the transom and over the telephone, and crawl under the bed, then all constitutional guarantees become meaningless ag-

gregation of words, as disconnected as a broken necklace whose beads have scattered on the floor.

Were it not for the Act of 1957, irresponsible agencies could be emboldened to tap wires to obtain unauthorized information for the use of social scavengers, discredited business sharpers, and political buccaneers. They could pry into the most personal dealings and the most sacred relationships. They could tear aside the curtain which shields what the lawyer says to his client, the physician to his patient, the minister to the parishioner, the priest to the penitent, the husband to his wife and the fiance to his betrothed. Without this guardian of our rights of privacy, every telephone user would have to conjure the possibility that the phantom hands of the electric eavesdropper could be clutching the very instrument into which he speaks.

Without the Act of 1957, the most malevolent scandalmonger could help himself at the banquet table of the most guarded secrets and commit burglary of the most precious jewels of family intimacies and yet be immune from the punishment befitting so heinous and immoral a practice, with the exception of some trifling penalty for malicious mischief or trespass.

Wire-tapping does not end with the mere listening operation. After the wire-leech has sucked in the blood of guarded secrets, he is then in a position to blackmail his unwary victim. He is in a position to traffic with corruption, threats and ill-gotten gains. That such a potential infamy could be tolerated in the name of the enforcement of the law would be the most extraordinary paradox in these paradoxical lines.

The Pennsylvania Legislature has recognized all these perils and has legislated against them. It becomes the duty of the courts to apply that legislation so that the Peeping Toms, the Paul Frys and the Meddlesome Charlies may not put to naught the expressed will of the people in defending the dignity of man, the

sanctity of family communication, and the liberty of its citizens.

The appellant maintains, inter alia, that the Philadelphia County courts had no jurisdiction to entertain a prosecution against him because the crime, if any was committed, occurred in Adams County where he allegedly made, via the telephone, the offer to bribe Donald C. Haas who was in Philadelphia County. This position is not well taken. The offer, without the reception in Philadelphia, would be without physical or legal effect. Nothing can happen that would give any court jurisdiction over an asserted offense until the offer is heard by the person to whom it is directed. The alleged offer made by Murray was allegedly heard in Philadelphia County. In *Commonwealth v. Taub,* 187 Pa. Superior Ct. 440 (1958), the defendant, while in Allegheny County, communicated over the telephone a threat to a person residing in Westmoreland County. The Superior Court held that the crime was effected in Westmoreland County and affirmed the jurisdiction undertaken by Westmoreland County over the offense involved.

The order of the Superior Court is reversed, the judgment of sentence of the Court of Quarter Sessions is reversed and a new trial ordered in accordance with this opinion.

CONCURRING OPINION BY MR. JUSTICE EAGEN:

I do not construe the Act of July 16, 1957, P. L. 956, §1, 15 P.S. §2443, to be aimed at the use of an ordinary extension telephone. It may well be that eavesdropping of every nature should be proscribed by statute but I am not persuaded that the legislation involved so intended. However, it is clear to me that the recording or wiretapping device used in the instant case was in violation of the statute and that the testimony of the witness Morris was sufficiently predicated upon

and tainted by this illegal activity to be inseparable therefrom.

I therefore concur in the grant of a new trial.

Mr. Justice JONES joins in this opinion.

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

Appellant was tried without a jury and convicted in the Court of Quarter Sessions of Philadelphia County for offering to bribe and bribing a corporate employee in violation of the Act of June 24, 1939, P. L. 872, §667, 18 P.S. §4667. The Superior Court affirmed the conviction. *Commonwealth v. Murray*, 206 Pa. Superior Ct. 298, 213 A. 2d 162 (1965). Appellant filed a petition for allowance of appeal which was granted by us. The facts of the case are set out in the opinion of the trial court. *Commonwealth v. Murray*, 35 Pa. D. & C. 2d 634, 635-39 (O. & T. and Ct. of Quarter Sessions, Philadelphia County, 1965).

Among the questions presented by this case is one of great significance and no little difficulty concerning Pennsylvania's so-called anti-wiretapping statute, the Act of July 16, 1957, P. L. 956, §1, 15 P.S. §2443. Specifically, we are called upon to decide whether the statute prohibits a private detective from testifying in a criminal trial to the contents of a telephone conversation between the defendant and another caller overheard on an extension phone by the detective without permission of the defendant, but with permission of the other caller.

The statute which we must apply to this case in pertinent part provides: "No person shall intercept a communication by telephone or telegraph without permission of the parties to such communication. No person shall install or employ any device for overhearing or recording communications passing through a telephone or telegraph line with intent to intercept a communication in violation of this act. No person shall divulge

or use the contents or purport of a communication intercepted in violation of this act. Whoever wilfully violates or aids, abets or procures a violation of this act is guilty of a misdemeanor, and shall be punishable by imprisonment of not more than one year, or by fine of not more than five thousand dollars ($5000), or both, and shall be liable to any person whose communication is unlawfully intercepted or divulged for treble the amount of any damage resulting from such unlawful interception, divulgence or use, but in no event less than one hundred dollars ($100) and a reasonable attorney's fee. The term 'person' includes natural persons, business associations, partnerships, corporations, or other legal entities, and persons acting or purporting to act for, or in behalf of, any government or subdivision thereof, whether Federal, State or local. The term 'divulge' includes divulgence to a fellow employe or official in government or private enterprise or in a judicial, administrative, legislative or other proceeding. Except as proof in a suit or prosecution for a violation of this act, no evidence obtained as a result of an unlawful interception shall be admissible in any such proceeding." Act of July 16, 1957, P. L. 956, §1, 15 P.S. §2443.

To interpret this provision the Commonwealth, in its brief, the dissent, and the Superior Court below rely in part on the majority opinion in *Rathbun v. United States,* 355 U. S. 107, 78 S. Ct. 161 (1957). In *Rathbun* the Supreme Court of the United States held that §605 of the Federal Communications Act[1] does not

---

[1] "No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such communication to

proscribe and hence preclude admission into evidence of testimony of a police officer who listened on an extension phone to a conversation of the defendant with a person who had consented to the overhearing. The Supreme Court's holding was based on a construction of the term interception which in the federal statute, like our own statute, is key to determining the range of conduct sought to be proscribed. In interpreting the Pennsylvania statute, we are of course bound in no way to accept the Supreme Court's interpretation of interception in the federal statute, as much persuasive weight as we naturally accord that Court's holding on the matter. Moreover, since our statute was adopted prior to the decision in *Rathbun*, at a time when lower federal courts disagreed on whether the federal statute reached the

---

its destination, or to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpena issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto; and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such information was so obtained, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of the same or any part thereof, or use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto: *Provided*, That this section shall not apply to the receiving divulging, publishing, or utilizing the contents of any radio communication broadcast, or transmitted by amateurs or others for the use of the general public, or relating to ships in distress." Act of June 19, 1934, c. 652, Title VI, §605, 48 Stat. 1103, 47 U.S.C. §605.

conduct in issue in the present case,[2] it is clearly impossible to infer from federal cases whether the Pennsylvania Legislature intended interception to encompass overhearing on an extension phone without the consent of one of the parties. I thus find it appropriate to examine and evaluate the considerations which underlie the decision in *Rathbun* as well as the other cases which have treated the question.

It is clear to me that the privacy of the telephoning public is the interest which must first arrest one's attention in dealing with this problem. A mere passing acquaintance with the daily newspaper suffices to substantiate the existence of a widely felt and insidious threat to individual privacy posed, not only by technological advances, but also by the evolution of contemporary social structures. A jealous regard for individual privacy is a judicial tradition of distinguished origin, buttressed in many areas by the imperative mandate of constitutional guarantees. Protection of individual privacy, however, appears frequently to reduce the methods available to law enforcement agencies in the detection and prosecution of crime. Few would deny that in this country today concern with the growth of criminal activity is of the same order of magnitude as the concern with the erosion of individual privacy. And, as Judge CLARK of the United States Court of Appeals for the Second Circuit pointed out in his excellent dissent in *United States v. Polakoff,* 112 F. 2d 888, 891-93 (2d Cir. 1940), the more broadly the legislative meaning of interception is interpreted, the more thoroughly insulated a means for criminal activity the telephone becomes. The majority in *Rathbun,* as well as most judges who reach the same result, also urge that to construe interception to include over-

---

[2] See cases cited in *Rathbun v. United States,* 355 U. S. 107, 109 nn.4-5, 78 S. Ct. 161, 162 nn.4-5 (1957).

hearing on an extension phone would be to impute to the Legislature the unlikely intention of proscribing as criminal the commonplace and innocuous convenience of having business associates and family members listen into a conversation without bothering to inform the caller.[3]

In evaluating these considerations, one is confronted first with the simple, salient fact that by enacting the Act of July 16, 1957, our Legislature in language nowhere conditioned by an expressed exception for use by any agency, police or otherwise, proscribed interception of telephone conversations without permission of the parties. By so doing, no one denies the Legislature decided that the right of any caller to the privacy of his phone conversation was more important than the interest served by permitting police or anyone else to tap wires. The statutory language "shall install or employ any device for overhearing" to my mind admits of no sensible distinction between a wiretap and an extension phone. Thus unless we are compelled by the statutory use of the word interception itself, a compulsion which I find impossible to entertain, there is no reason for concluding, as the dissenting and other concurring opinion apparently does, that

_____

[3] In addition, the dissent urges that this construction would have the untoward result of preventing police from listening and tracing a kidnap call. As to the tracing of calls, I am not certain the dissent is correct in its unstated assumption that tracing requires listening in by a party other than a recipient. In any event, the case in which overhearing a telephone conversation appears necessary to save the life of a kidnap victim is a difficult one fortunately not before us now. I am unprepared, however, to say now that the provisions of this statute would not yield an exception where life is at stake, although I certainly believe a clarifying amendment to the statute to cover such situations would obviate doubt and judicial difficulty. See, e.g., Schwartz, On Current Proposals To Legalize Wire Tapping, 103 U. Pa. L. Rev. 157, 165-67 (1954).

while the Legislature clearly valued individual privacy more highly than the right to tap wires without permission, it nonetheless valued individual privacy less than the right to overhear conversations by an extension phone without permission.  Indeed I am at a complete loss to imagine what purpose is served by a statute, which at the outset requires permission of more than one of the parties to "interception" of a telephone conversation, if by the simple expedient of resorting to listening in on an extension telephone, the needed permission of one of the parties is completely dispensed with.  To so hold, would I believe, obliterate the practical effect which, as the majority opinion indicates, the Legislature had very distinctly in mind.[4]  Moreover, if overhearing by extension phone without consent of one party is not proscribed by the statute it seems obvious that such overhearing without consent of either party would not be proscribed.  Thus, users of the telephone would be at the mercy of those who wish to pry into confidences intended by neither user to reach other ears.  Such results I am extremely reluctant to believe the Legislature intended.

The argument that to construe the statute to proscribe overhearing on extension phones would make criminally liable numerous business associates and relatives who listen into phone conversations unbeknownst to one caller, however, remains as a difficulty.  It may well be sufficient to answer this difficulty by saying that the language of the statute taken as a whole and read with common sense leaves no doubt in my mind that the Legislature intended to prevent the conduct at issue in this case, while the case of the overhearing secretary or relative may be dealt with when and if it arises.  In any event, however, I believe the difficulty could be overcome by construing the statutory term

[4] Compare Dash, The Eavesdroppers 406-21 (1959).

"permission" to encompass both expressed and implied permission. Thus when a call is made in circumstances where it would ordinarily be unreasonable to believe that one caller would have any objection to the overhearing of the conversation on an extension phone, I see no reason why that caller's permission cannot be implied, and I seriously doubt whether substantial practical difficulty would result from such a rule.[5] Admittedly, such a construction of the statutory term "permission" is not the most natural one, and I would not be inclined to adopt it in the normal course of statutory interpretation. But if absent such a construction of permission here, I would find myself forced to the Hobson's choice of emasculating the practical effect of the statute or construing it to impose criminal liability for conduct which I find it hard to imagine the Legislature deemed even faintly undesirable, then that is the construction I would adopt. Finally, it reassures me no little amount that the solution of this problem suggested here is substantially along the lines followed by Judge LEARNED HAND in *Polakoff*.

Because of my interpretation of the statute, it is of course unnecessary for me to discuss whether the detective's testimony should have been excluded because fatally infected by his reading of the transcript of the illegally made wiretape recording. I do deem it worth mentioning, though the contention is not raised in the

---

[5] In 1940 the United States Court of Appeals for the Second Circuit wrote an opinion suggesting that the problem of innocent overhearing by business associates or family members be dealt with in this way. *United States v. Polakoff*, 112 F. 2d 888 (2d Cir. 1940 (L. HAND, J.)). That *Polakoff* view remained the law in one of the most populous areas of this country for seventeen years until *Rathbun*. Yet with the conceivable exception of *Reitmeister v. Reitmeister*, 162 F. 2d 691 (2d Cir. 1947), I have found no reported case involving the difficult factual situations of the type conjured up by the *Rathbun* majority.

Commonwealth's brief, that under the facts of this case the admission of the detective's testimony, though corroborated by evidence deemed sufficient by the trial judge to sustain the conviction independently, cannot preclude our reversal. To begin with I fail to see how the effect of the detective's testimony did not inevitably play an instrumental role in the trial court's verdict. This is not a case in which the other evidence of guilt strikes me as overwhelming. More importantly, failing to reverse a trial in which the evidence was admitted in violation of the Act of July 16, 1957 would hardly evidence the proper degree of respect for the Legislature's command, see *Kotteakos v. United States,* 328 U. S. 750, 764-65, 66 S. Ct. 1239, 1248 (1946), in light of the particular emphasis on exclusion which the statute contains.

Appellant attacks his conviction for offering to bribe on the ground that the Court of Quarter Sessions of Philadelphia County lacked jurisdiction of the offense. The alleged offer was made in telephone conversations during which appellant was admittedly in Adams County while the offeree of the bribe was in Philadelphia County. Appellant correctly points out that a criminal case may normally not be tried outside the county in which the alleged offense was committed. *Commonwealth ex rel. Chatary v. Nailon,* 416 Pa. 280, 206 A. 2d 43 (1965); *Commonwealth v. Mull,* 316 Pa. 424, 175 Atl. 418 (1934). He argues, in effect, that the statutory language defining the offense of offering a bribe limits the locus of the crime to an area immediately surrounding the person of the offeror at the moment the offer is dispatched.[6] I see no reason why

[6] In *State v. Noland,* 204 N.C. 329, 168 S.E. 412 (1933), the only reported case I have found dealing with the precise question here, the court concluded that jurisdiction of a trial of an intercounty offering to bribe by telephone lay in the county where the offer was heard. Since *Noland* lists no reasons for its conclusion

such a limitation is compelled by the language "whoever offers or gives" in a case where the offeror utilizes an instrumentality which he intends, and which does in fact, transmit his offer to another location. See *United States v. Thayer*, 209 U. S. 39, 28 S. Ct. 426 (1908) (HOLMES, J.) ; *Commonwealth v. Taub*, 187 Pa. Superior Ct. 440, 144 A. 2d 628 (1958); *Commonwealth v. Keenan*, 28 Pa. D. & C. 2d 41 (Ct. of Quarter Sessions, Philadelphia County), aff'd mem., 199 Pa. Superior Ct. 1, 184 A. 2d 793 (1962). Appellant urges that the *Keenan* case, which involved a prosecution for blackmail in Philadelphia County under the Act of June 24, 1939, P. L. 872, §805, 18 P.S. §4805, of a defendant who telephoned a threat from another county to Philadelphia, is distinguishable because the blackmail statute penalizes "whoever sends or delivers or utters" a threat and because jurisdiction in *Keenan* must therefore have been conferred on the Philadelphia court solely by virtue of the fact that the threat was *delivered* in Philadelphia. To employ the verb "deliver" to describe the process by which a caller's conduct effects the transmission of words to a listener in a telephone conversation involves, in my opinion, no less strain on common usage than to characterize the same process by the words "send" or "utter". Thus, I find no reason to believe that jurisdiction in *Keenan* depended solely on the verb deliver. Moreover, I find nothing in the appellant's citation of *Commonwealth ex rel. Sickler v. Yaukey*, 11 Pa. D. & C. 2d 11 (C.P. Fulton County, 1956) which persuades me to the contrary.

Appellant also seeks to distinguish *Taub*. In that case it was held that jurisdiction of a surety of the peace proceeding under the Act of March 31, 1860,

---

I do not deem it of important weight in resolving the question here.

P. L. 427, §6, 19 P.S. §23 was properly exercised by the Court of Quarter Sessions of Westmoreland County over a threat telephoned by the defendant from Allegheny County to a woman in Westmoreland County. The basis of this distinction, appellant urges, is that the state of mind of the recipient of the call in *Taub* was an element of the offense and hence the offense could be located in the county where the woman heard the threat, whereas in the instant case the offeree of the bribe's state of mind is irrelevant to the offense. What appellant disregards, however, is that the offense of offering to bribe can hardly be made out absent perception by the offeree of the offer. Whether or not this perception is correctly characterized as a "state of mind", is thus irrelevant. Appellant's reliance on the language in *Commonwealth v. Friedman*, 193 Pa. Superior Ct. 640, 644, 165 A. 2d 678, 681 (1960) that words spoken by the defendant are the "gist" of the crime of offering to bribe is hardly well placed. In the *Friedman* case the issue of the trial court's jurisdiction over the offense was neither raised nor discussed, and the language was used in such a way as to persuade me that the court did not intend by it a catalogue of all the elements of the offense of offering to bribe.

Because appellant's conviction must be overturned due to the inadmissibility of the detective's testimony, I do not deem it necessary to discuss the nonjurisdictional questions raised by appellant.

Mr. Justice O'BRIEN joins in this opinion.

———

DISSENTING OPINION BY MR. JUSTICE COHEN:

The majority opinion proposes that the use by the private investigator of the extension telephone to overhear the conversation between defendant and the corporate employee was an interception and that because defendant did not consent, the investigator's testimony

was inadmissible under the statute. This exact issue has not previously arisen in Pennsylvania, but was decided by the United State Supreme Court in *Rathbun v. United States*, 355 U. S. 107 (1957). In that case, the accused was charged with transmitting a threatening interstate communication by telephone in violation of federal statutes. Police officers were permitted to testify that they had heard the accused make the threat in question when, with the consent of the person threatened, they listened to the incriminating telephone conversation over a regularly used telephone extension. Section 605 of the Federal Communications Act provides that no person not being authorized by the sender shall intercept any communication by telephone and divulge its existence or contents. The Supreme Court held that §605 was not violated because there was no interception as Congress intended that the word be used. Thus the Supreme Court of the United States has declared that the act of listening to a conversation over an extension telephone is not an interception, and it is irrelevant whether or not there was consent by one or both of the parties. "Each party to a telephone conversation takes the risk that the other party may have an extension telephone and may allow another to overhear the conversation. When such takes place there has been no violation of any privacy of which the parties may complain." 355 U. S. 111. Accordingly, it should be apparent, there is no interception in the present case and there can be no application of the Pennsylvania wire tap statute.

The dangers inherent in the majority decision are obvious. It will unreasonably hamper the police in their enforcement and investigatory techniques more than any other decision possibly could. As a result of the majority opinion the police will be forbidden, under penalty of law, to overhear a telephone request for ransom in a kidnapping case; and the obscene or

threatening telephone caller will be able to harass and terrify his defenseless victim, secure in the knowledge that neither the police nor the telephone operator may listen in for the purpose of obtaining evidence or tracing the call. That the United States Supreme Court recognized this reasoning is evidenced by the observation in *Rathbun* that: "The telephone extension is a widely used instrument of home and office, yet with nothing to evidence congressional intent, petitioner argues that Congress meant to place a severe restriction on its ordinary use by subscribers, denying them the right to allow a family member, an employee, a trusted friend, or even the police to listen to a conversation to which a subscriber is a party. Section 605 points to the opposite conclusion." 355 U. S. at 109, 110. I believe that the same reasoning applies to the present matter.

Inasmuch as I have determined that no interception occurred in this case, I find it unnecessary to discuss the differences between the federal act which requires the consent of only the sender of the communication and the Pennsylvania statute which requires the consent of both parties before a lawful interception may be effected. Obviously, if there is no interception, neither statute can be applicable.

The lower court excluded from evidence the recording of the conversation between defendant and the corporate employee. However, the court did allow the investigator to testify concerning the contents of the conversation which he had overheard on the extension despite the fact that he stated that on at least three occasions he had read a typewritten transcript of that conversation. The majority opinion contends that this is error because the witness was testifying from what he recalled the transcript said, not from what he recalled of the conversation itself. This is incorrect, for the witness stated that he did not use the transcript to re-

fresh his recollection; rather, he testified that he was able to recall from memory alone those portions of the conversation which incriminated the defendant. Furthermore, even though the use of the recording device at the switchboard may be an illegal interception within the meaning of our statute, the same evidence obtained by an independent source at the extension is not rendered inadmissible thereby. *Nardone v. United States,* 308 U. S. 338 (1939). In the present matter there existed in the private investigator such an independent source of evidence that the "connection between any possible violation of the statute and his testimony had 'become so attenuated as to dissipate the taint' in its relation to admissibility." *Monroe v. United States,* 234 F. 2d 49, 57 (D.C. Cir. 1956), citing *Nardone v. United States,* supra.

Because the offer to bribe was made over the telephone in Adams County, defendant argues that the Philadelphia court lacked jurisdiction to try the offense. With regard to this matter, I agree with the language of the Superior Court that "the crime [of offering to bribe] is not complete until the offer is received by [the offeree] who, in this case, was in Philadelphia County. . . . [and that the] charge . . . cannot be sustained in the absence of some contact, communication, or conversation with the person alleged to have been bribed." *Commonwealth v. Murray,* 206 Pa. Superior Ct. 298, 301, 213 A. 2d 162, 164 (1965). Since the completed offense took place in Philadelphia where the offer was heard, the trial court properly exercised jurisdiction.

Finally, the statute here involved provides, "Whoever offers or gives to any . . . employe . . . of another . . . money . . . without the knowledge and consent of the employer . . ." is guilty of an offense. Defendant argues that no crime was committed because the arrangements for the transfer of the blueprints and

money were made with the knowledge and consent of the employer. This is an incorrect interpretation of the statute, for the crime may be committed by a mere offer to bribe. The testimony proves that at the time the illegal offer was made, the corporation was without knowledge of the bribe. The arrangements allowing the employee to accept the bribe were made to obtain corroborating evidence. Hence, in this instance, the crime was complete when the original offer was made.

I dissent.