**UNITED STATES of America,
Plaintiff,**

v.

**Basil VESPE, Defendant.**

**Crim. A. No. 74–71.**

United States District Court,
D. Delaware.

Jan. 31, 1975.

Ralph F. Keil, U. S. Atty. and Bruce L. Thall, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

Victor F. Battaglia and William H. Uffelman, of Biggs & Battaglia, Wilmington, Del., for defendant.

## OPINION AND ORDER

LATCHUM, Chief Judge.

On August 6, 1974, the Grand Jury returned a four count indictment[1] against Albert Martin ("Monk") Shaffer, Jr. and Basil Vespe.[2] The first three counts charged Shaffer with three substantive violations of either traveling in interstate commerce, or using and causing to be used interstate telephone facilities, with intent to carry on an unlawful activity involving extortion in violation of 18 U.S.C. § 1952(a)(3). The fourth count charged Shaffer and Vespe jointly with conspiracy to travel in interstate commerce and to use or caused to be used interstate telephone facilities with the intent of carrying on an unlawful activity, i.e., extortion, in violation of 18 U.S.C. § 371.

Both defendants filed pre-trial motions to dismiss the indictment under Rule 7(c), F.R.Crim.P., on the ground that it failed to charge any offense.[3] These motions were denied on September 23, 1974, United States v. Shaffer, et al., 383 F.Supp. 339 (D.Del.1974).

On September 15, 1974, Shaffer was found shot to death[4] in his home state of New Jersey which left Vespe as the sole defendant to stand trial on Count IV of the indictment.

Trial commenced on October 15, 1974 and concluded on October 22. The jury found Vespe guilty as charged. The case is now before the Court on defendant's motion for judgment of acquittal pursuant to Rule 29(c) or for a new trial, pursuant to Rule 33, F.R.Crim.P. The Court will treat the two motions separately.

## I. MOTION FOR JUDGMENT OF ACQUITTAL

The applicable standard when passing on a motion of judgment for acquittal after trial under Rule 29(c) is well settled. "[T]he Court scrutinizes the evidence, including reasonable inferences to be drawn therefrom, from the point of view most favorable to the government and assumes the truth thereof. If there is substantial evidence justifying the inference of guilt, irrespective of the evidence adduced by the defendant, the Court must deny the motion." United States v. McGonigal, 214 F.Supp. 621, 622 (D.Del.1963); United States v. Roy, 213 F.Supp. 479, 480 (D.Del. 1963).

Count IV of the indictment relating specifically to Vespe charged that he and Shaffer, in violation of 18 U.S.C. § 371, did willfully and knowingly combine, conspire, and agree with each other to violate 18 U.S.C. § 1952(a)(3) by (1) traveling in interstate commerce between New Jersey and Delaware and (2) by using and causing to be used interstate telephone facilities from New Jersey to Delaware with the intent to carry on the unlawful activity of extortion, to wit, the obtaining of monies from Joseph Remedio through threats of physical injury and property damage in violation of Delaware law, 11 Del.C. § 846(1) and (2). The indictment charges eight overt acts were committed in furtherance of the conspiracy as follows: Shaffer traveled from New Jersey to Delaware on July 10, 1974 and used interstate telephone facilities on July 10, 12 and 22, 1974 and that Vespe traveled from New Jersey to Delaware on July 17, 1974 and used interstate telephone facilities on July 12, 15 and 22, 1974.

The Court charged the jury that in order to convict Vespe for conspiracy

1. Docket Item 1.

2. Following the return of the indictment Shaffer was represented by David Snellenburg, II, Esquire. Vespe was originally represented by William H. Uffelman, Esquire, then by Joel D. Tenenbaum, Esquire, and finally by Henry A. Wise, Jr., Esquire, who acted as Vespe's trial counsel.

3. Docket Items 2 & 10.

4. Docket Item 23.

the government was required to prove beyond a reasonable doubt (1) that the conspiracy described in the indictment was willfully formed, and was existing at or about the time alleged; (2) that the defendant willfully became a member of the conspiracy; (3) that one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment at or about the time and place alleged; and (4) that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy. (Tr. 740).[5]

### A. *Insufficient Evidence.*

The first ground of the motion for judgment of acquittal is based on defendant's contention that there was insufficient evidence to show the existence of an agreement between Shaffer and Vespe to obtain money from Joseph Remedio through the use of threats.

The evidence adduced at trial from the point of view most favorable to the government reveals the following facts: Joseph W. Remedio ("Remedio") is a general contractor with offices in Wilmington, Delaware, who has been in the construction business in Wilmington and the surrounding areas for 24 years. (Tr. 104–105). As a general contractor, he bids on proposed construction jobs, and if he is awarded the project as the low bidder, he oversees and builds the project with the use of subcontractors and his own employees. (Tr. 104–105). Remedio first established a business relationship with Vespe, a concrete subcontractor, beginning in 1970 in connection with the Peck Sussex Rug Mills building that Remedio was constructing at Bridgeville, Delaware. (Tr. 106, 109, 219, 631–632). In 1971, Vespe's firm also was the concrete subcontractor on two high-rise public housing projects being built by Remedio at Millville and Penns Grove, New Jersey. (Tr. 111). A dispute arose over Vespe's performance and his subcontracts on these projects were terminated with the result

that there is civil litigation pending in a New Jersey state court in which both Remedio and Vespe claim each is owed money by the other. (Tr. 112, 184, 220).

Sometime about September 1973, Remedio was visited by two brothers from Philadelphia by the name of DeCarlo, (Tr. 113, 237, 489); they presented a document purportedly signed by Vespe, addressed "To Whom It May Concern" which authorized DeCarlo to collect any balances due Vespe without mentioning any amount or any specific project on which Vespe worked. (Tr. 113–114). The DeCarlos stated they were sent down to collect a balance for Vespe of approximately fifty to sixty thousand dollars and wanted to know what Remedio intended to do about it. (Tr. 114). Remedio responded that he owed Vespe no money, that all money had been expended on the project to complete Vespe's unperformed subcontract work, and that he was not going to pay any additional sum. (Tr. 114). When the DeCarlos were told this, they began to threaten Remedio and specifically stated that they knew that he had a nice family, and if he didn't want any trouble and anybody to get hurt, he better start paying his debt. (Tr. 114–115).

On July 3, 1974 when Remedio returned to his office he found two telephone messages to call Shaffer, whom he did not know (Tr. 123), immediately on a subject matter of importance. (Tr. 115). Remedio was unable to reach Shaffer by telephone until the following day, July 4. Shaffer told Remedio he wanted to discuss the Vespe matter. When Remedio indicated there was nothing to discuss and that their attorneys were handling the matter which was already in court (Tr. 116), Shaffer responded that he wished to hear nothing about a court or lawyers, that he was coming to see Remedio at his Wilmington office on Monday or Tuesday, that he had better be there, that, if Remedio was not in his office when Shaffer ar-

---

5. Tr. refers to the Trial Transcript.

rived, it was going to be too bad for him and that he could get a bullet in his head. (Tr. 116–117).

Following Shaffer's telephone conversation, Remedio called Detective Lt. Terrence Patton of the Wilmington Police Bureau (Tr. 123, 62), Remedio's brother-in-law (Tr. 124, 62), and related to him Shaffer's telephone threats and the earlier visit of the DeCarlo brothers. (Tr. 122–123). Patton advised Remedio to contact him if he heard from Shaffer again. (Tr. 123). The following Monday and Tuesday (July 8 and 9) Remedio heard nothing further from Shaffer. (Tr. 123). Remedio had been in the process of moving his offices, a move which had been completed over the preceding weekend. (Tr. 123, 106).

On July 10 (a Wednesday) Shaffer telephoned Remedio's office and stated: "We went to your old office and we just found out you moved; we will be there in ten minutes, don't leave." (Tr. 124). Remedio immediately contacted his brother-in-law, Detective Patton, who told Remedio to detain Shaffer in the front office until the police officers could arrive. (Tr. 124).

Detectives Patton and Leroy H. Landon soon thereafter arrived at Remedio's new place of business and were ushered back to Remedio's office. Shaffer and an associate were already in the reception area waiting to see Remedio when the detectives arrived. (Tr. 125, 67–69, 77). The detectives were wearing plain clothes and when Shaffer and his associate were shown into Remedio's office, Remedio introduced them as his business associates. (Tr. 125, 69, 78–79).

Shaffer introduced himself to Remedio and indicated he was there "to talk about the Vespe matter." He stated that Vespe contended Remedio owed Vespe over $80,000. Shaffer claimed he was with the organization, was comptroller, and had been authorized to collect any accounts receivable. (Tr. 126). After Remedio told Shaffer that he had terminated Vespe's subcontract on the Millville project because he refused to

take corrective measures, Shaffer said: "Vespe owes me $400,000 and I want it," and that "we are visiting all the accounts receivable, and it seems like there were four of them just like yours, they are all in court, and I am getting to the bottom of it because I am owed all this money." (Tr. 127). Shaffer also said that although he was the comptroller, he still had a large investment in the corporation, and was upset about the expenditures that Vespe had made, such as a 51-foot yacht charged to the company. (Tr. 127–128). Remedio showed Shaffer documents supporting his position that no money was owed. After about a half hour of discussion, Shaffer, stating that he had seen enough and felt satisfied, said that he would be in touch with the attorneys handling the litigation and then left the meeting with his associate. (Tr. 128–129).

Shaffer made no threats (Tr. 75) at the meeting although the discussions were somewhat tense. (Tr. 70–71, 81, 87). Before leaving, Shaffer was informed by Remedio that Patton and Landon were Wilmington detectives and that Patton was his brother-in-law. (Tr. 71). Remedio told Shaffer: "I didn't know who you fellows were; I was afraid of you, frankly, and I felt I needed somebody here to help me out." (Tr. 71).

Patton and Landon substantiated Remedio's testimony of the tenor and content of the meeting with Shaffer and his associate. (Tr. 65–71, 77–82). In addition, Detective Landon testified that upon entering Remedio's office he noticed a black chauffeur-driven limousine parked outside and he took down the license number. (Tr. 78). Landon testified that he believed the limousine that Shaffer had at Remedio's office was the same, or at least it looked like the same, automobile that Vespe later used to visit Remedio. (Tr. 92, 95–96).

Approximately forty minutes after Shaffer left the meeting, Remedio received a telephone call from Shaffer. (Tr. 129–130). Shaffer began the con-

versation by saying "What do you take me for, some damn fool, . . . having police in your office." (Tr. 130). He then stated that Vespe contended Remedio owed Vespe over $80,000 and that he was going to collect it, that beginning on Friday Remedio was going to pay $10,000 a week. (Tr. 131). Remedio first stated he didn't owe Vespe a dime (Tr. 130), and after being pressed by Shaffer said he didn't have $10,000 a week as things were tight in the construction business. (Tr. 131). Shaffer responded: "Well, you better raise it. We are going to chip at you a little at a time. I know where you live, I know you got a wife and son.. We are going to get your wife or your son first to show you we mean business, and I got the men to do it. . . . So $10,000 a week or you're a dead Dago." (Tr. 131). When Remedio again protested, Shaffer repeated that Remedio had better start paying or he was going to be dead, that they meant business, that they would hit his son or his wife first and maybe pick off his brother, that they knew where Remedio lives and that "I don't give a damn if you tell the police, you can't watch your family night and day." (Tr. 131–132). He further ordered Remedio to start sending the money to Basil's (Vespe) office every Friday. (Tr. 132). He first wanted the money to be sent in cash, but, after Remedio objected, Shaffer agreed to checks saying "Okay, start sending checks, and if you want to, you can make them out to Vespe Contracting Company," and deduct the amount of the payment from the $80,000 and show the running balance with each payment made. (Tr. 132). When Remedio asked how he would know whether any checks he sent would be credited to the amount allegedly owed, Shaffer advised him not to worry as he was in Vespe's office at the time he was telephoning Remedio. (Tr. 133).

Just before Shaffer hung up, Remedio received a phone call on another line from the Wilmington Detective Division. (Tr. 133–134). After Shaffer's call was terminated, Remedio crossed to the other line and was advised by Detective Patton to come to the police station because they had run a background check on Shaffer which showed him to be "a very violent man." (Tr. 133–134). Remedio told Patton that he had just been threatened on the phone by Shaffer and he went directly to the police station. (Tr. 133–134, 72–73).

At the police station, Remedio made a formal complaint and the Wilmington Police contacted the FBI. After FBI agents were called in, Remedio agreed to have electronic devices installed in his offices to monitor and record any telephone conversations he might have with Shaffer or Vespe. (Tr. 134, 136, 83). Upon dictating a report of his contacts with the DeCarlo brothers and Shaffer, Remedio, frightened for the safety of his family and himself, employed off-duty Wilmington police officers to guard his home, his office and members of his family on a 24-hour basis at a weekly cost of $1,900. (Tr. 99, 84–85, 135).

On Friday, July 12, the date when Remedio was to send his check to Vespe at Shaffer's direction, Remedio placed a phone call to Vespe at his office in Bellmawr, New Jersey. (Tr. 136). Vespe was not in but returned Remedio's call at 10:10 A.M. on that day. (PX 3, Tr. 53–54). During the course of this conversation, Remedio informed Vespe that Shaffer had threatened him, that he had demanded $10,000 be sent to Vespe every Friday, that he was scared and asked whether Shaffer worked for Vespe and whether Vespe condoned such threats. (Tr. 137–139, TT I., pp. 1–3).[6]

6. TT refers to the typewritten transcripts of the taped conversations (PX 4a–e, 5a and b) that Remedio had with Shaffer and Vespe that the jury used as an aid when listening to the tapes. (Tr. 157). The transcripts of the five taped conversations are referred to by roman numerals I through V. See United States v. Lawson, 347 F.Supp. 144 (E.D.Pa.1972).

Vespe indicated he had no knowledge of what transpired between Shaffer and Remedio and stated he had no control over what Shaffer said or did. (Tr. 139, 141, TT I., pp. 2, 4). Vespe admitted that Shaffer worked for him and was authorized to collect money for him. (TT I., pp. 3, 5, Tr. 486, 488, 492–494). When Vespe was talking to Remedio he stated: "You know, you might have me on tape but I'm not saying nothing. I'm . . . I'm too smart. I don't know what I've done. I haven't done no thing to ya. I don't know whether Al Shaffer threatened you or not but if a guy comes into your office, ah, even if he works for me, I can't control what a guy says or what a guy does, you follow me." (TT I., p. 4, Tr. 140).

Vespe also indicated Shaffer was a dangerous person even though Vespe didn't condone violence. (Tr. 138–139). He also stated, "I don't know that much about the guy. I know the guy does have some problems with the law." (TT I., p. 4). "Some people say he's been indicted for 9. . . ." (TT I., p. 9). After an interruption by Remedio, Vespe continued, "And, ah, I don't know whether it's true or not some of the things that they say, I read in the paper where he was indicted for murder and I. . . ." (TT I., p. 9). Vespe continued referring to Shaffer's general reputation, "They'll impress ya that the guy is a bad hombre. The guy is just, doesn't have any reality for, ah, life, for jail. I mean he's been in jail." (TT I., p. 9). When Remedio asked why Shaffer was working for him, Vespe commented, "Well, because occasionally he, ah, he's very good, shall we say, he's not a scared to fight, you know a lot of times you gotta go out on a job and fight with the colored people." (TT I., p. 9). Vespe also told Remedio that Shaffer carried a gun and he knew Shaffer could use it. (TT I., p. 10). Vespe also admitted he had sent Shaffer

down to see Remedio after having gone over the accounts receivable with Shaffer but not to scare him. (TT I., p. 10).

Vespe also admitted having previously sent Vince DeCarlo to Delaware to talk to Remedio about paying Vespe the money he claimed was owing. (TT I., p. 15). Because Remedio was afraid of Shaffer, he asked Vespe to call Shaffer off and asked whether it would be all right for Remedio to send $1,000 instead of $10,000 demanded by Shaffer. (TT I., pp. 16–17, Tr. 153). Interspersed throughout the conversation Vespe stressed he did not condone or advocate violence and that he simply wanted to meet personally with Remedio in order to talk the matter over. (TT I., pp. 14–15). Regarding Remedio's request that he send a $1,000 check, Vespe said he would get back to him after about twenty minutes. (TT I., p. 17, Tr. 159).

Later on July 12 at 10:51 A.M. another phone call was placed from Vespe's New Jersey offices to Remedio in Delaware, (PX 3) with Shaffer making the call to Remedio. (Tr. 159). In the course of this conversation, Shaffer wanted to know why he had not received the $10,000 check as he had previously demanded and stated that the matter was out of Vespe's hands. (Tr. 159–160, TT II., p. 1). Shaffer told Remedio he had to be more careful in driving as he had gone through a stop sign at Concord Avenue in Wilmington and Vespe would never get his money. (TT II., pp. 1–2)[7] Shaffer said that he was in Vespe's office at the time of the call (TT II., p. 4), that he expected a check to be mailed to him that day or he would come pick it up (TT II., pp. 4–5), and that, "If you ain't got it this week, borrow it, sell your wife, your ass, sell your car, but get it, Joe. I waited two . . . years, I ain't waiting no more." (TT II., p. 3). Remedio mailed a check for $1,000 on July 12, 1974 to Vespe. (PX 2).

---

7. In Vespe's earlier telephone conversation with Remedio he had referred to the possibility that he would not get his money: "If God forbid, you got into an automobile accident and which I'd hate to see." (TT I., p. 6).

On Monday, July 15, at 10:49 A.M. Vespe again telephoned Remedio from Vespe's New Jersey office. (PX 3, Tr. 165–166, TT III.). Vespe indicated he had received the check sent by Remedio and that he was going to hold it pending a meeting to be set up between Remedio and himself. (Tr. 165–166, TT III., p. 1). Vespe was apparently aware of Shaffer's conversation with Remedio on July 12, because when Remedio indicated to Vespe that Shaffer had called him after he had talked to Vespe, Vespe replied, "Alright, well things are, I think things are calmed down now." (TT III., p. 1). Vespe made this statement even before Remedio explained the "maniac" behavior of Shaffer. (TT III., p. 1). Vespe set up a meeting with Remedio in his office in Wilmington for Wednesday, July 17, the hour to be set later by Remedio. (TT III., p. 14, Tr. 167). About noon on Thursday, July 17, Remedio called Vespe and the meeting was set for that evening. (Tr. 167–168).

Vespe arrived at Remedio's office at about 7:15 or 7:30 P.M. (Tr. 168). Detective Landon testified that the chauffeur-driven limousine in which Vespe arrived appeared to be the same automobile in which Shaffer had arrived at Remedio's office a week earlier. (Tr. 91–92, 94–96). During this conference, the disagreements between Vespe and Remedio regarding the work Vespe had subcontracted to perform and which Remedio claimed he did not complete were discussed in detail with Vespe claiming he was owed a large sum by Remedio. (Tr. 169, TT IV.).[8] In the course of this conversation, Vespe discussed a lengthy hypothetical in which he hypothesized a situation in which, if he were a contractor approached by a mob controlled company that indicated he owed them a substantial sum of money, and his alternatives were to pay or be shot and he knew he owed the money, he would pay the sum claimed. (TT IV., pp. 33–34). In addition, Vespe at times

reinforced Remedio's impression of how dangerous Shaffer was while in the same conversation stating he did not like and did not condone violence. For example, the following took place at one point (TT IV., p. 43):

*Vespe:* I'm sure, Joe, that you've checked the guy's, ah. . . .

*Remedio:* You're goddamn right I checked.

*Daniel Remedio:* We know all about him.

*Vespe:* I'm sure that you know the guy's been indicted, what, eleven times for murder.

*Remedio:* I don't know about that. Eleven times for murder?

*Vespe:* Eleven times. That's what they say.

Remedio wanted the New Jersey court to decide the dispute and did not want Shaffer involved; Vespe appeared to agree to this resolution. (Tr. 171–172).

Nothing more was heard of the matter until Monday, July 22, at 10:48 A.M. when Shaffer telephoned Remedio in Wilmington from Vespe's office. (PX 3, Tr. 172, TT V.). In this conversation, Shaffer asked Remedio why he had not received another check from Remedio. (Tr. 172, TT V., p. 1). When Remedio tried to tell Shaffer that he and Vespe had resolved the matter and were to proceed with the New Jersey court action, Shaffer became belligerent and in no uncertain terms indicated his displeasure at any possible resolution other than his understanding that Remedio was going to pay $60,000. (Tr. 172, TT V., p. 1). Shaffer also indicated that Vespe was no longer involved in the collection of the debt, and to show Remedio that Vespe had turned the collection matter over to the control of Shaffer, Shaffer had Vespe get on a phone extension and the following dialogue occurred. (Tr. 172, TT V., pp. 2–3):

---

8. In addition to Vespe and Remedio at the July 17 meeting was Daniel Remedio, Remedio's brother. (Tr. 168, 171).

*Shaffer:* He's gonna call ya and tell ya, wait a minute, hold on, is Basil in the office? Is Basil upstairs? Would ya ring him? What lines he on? Yeah, I'm on 28. Yes.

*Vespe:* Hello.

*Shaffer:* Basil?

*Vespe:* Yeah.

*Shaffer:* Yeah you're on the same line the three of us with Joe, Joe Remedio, now now I want you to say once and for all. I told you not to go to Delaware. You went to Delaware, okay. Now you come back and cut it down to $60,000. Now Joe, you hear me?

*Remedio:* I'm listening.

*Shaffer:* Alright, Basil, stay the fuck out of my business with Joe Remedio.

*Remedio:* Now, Basil, he says it's his business again.

*Vespe:* Right.

*Remedio:* Now.

*Vespe:* You got it Monk.

*Remedio:* Huh?

*Shaffer:* You hear the man on the phone?

*Vespe:* You got it.

Special Agent Andrew M. Palumbo of the FBI interviewed Vespe on July 25, 1974 following his arrest in this case. (Tr. 34–36). Palumbo testified that Vespe indicated to him that he knew Shaffer and had known him for a number of years. (Tr. 38). Vespe also stated that Shaffer had told Vespe that Shaffer knew Remedio, and that Shaffer had traveled to Wilmington, Delaware to meet with Remedio in order to discuss arrangements through which Remedio would pay Vespe funds Vespe claimed were owed by Remedio. (Tr. 39). Vespe stated specifically he had sent Shaffer for the purpose of collecting $87,000, and that Shaffer had authority to collect the $87,000. (Tr. 40). In addition, Vespe showed to Palumbo a cover letter and an original $1,000 check made payable to Vespe's company drawn on Remedio's construction company in Wilmington. (Tr. 41–43; PX 2). Vespe testified that in January of 1974 he learned that Shaffer was in the accounts receivable business. Vespe did not know the name of the business, nor whether there were any offices from which Shaffer operated. He did not know whether anyone worked for Shaffer in connection with his business. (Tr. 486–487).

Vespe also testified that in January or February of 1974, he decided to employ Shaffer to assist in collecting Vespe's accounts receivables. (Tr. 488). Vespe stated that he made no attempt at that time to contact any other firm prior to employing the services of Shaffer. (Tr. 490). According to Vespe, most accounts receivable firms work on a percentage basis, but Shaffer was only to be paid if Vespe was satisfied with the amount that he received from those whom he claimed owed him money. (Tr. 492). Vespe stated that Shaffer would receive $2,500 per satisfactory settlement (Tr. 493–494), but that Shaffer never received any funds whatsoever because a satisfactory settlement was never reached on any account with which Shaffer had been involved. (Tr. 494). In fact, Vespe indicated that the only instance in which he was aware that Shaffer had been involved in any way in trying to collect an outstanding claim on behalf of Vespe's business was with Remedio. (Tr. 495). In addition, Vespe stated that Shaffer helped around the office by answering the telephone and also carried cash payrolls to job sites because he had a license to carry a gun. (Tr. 498–499). Yet, Vespe did not pay Shaffer for any of these last mentioned services. (Tr. 499–500). Vespe also indicated that Shaffer had no ability as an accountant (Tr. 528–529), and that he must have discussed Shaffer's visiting Remedio some time prior to Shaffer's visit to Delaware on July 10 and perhaps somewhat earlier. (Tr. 531–532). Furthermore, Vespe admitted that he had spoken with Shaffer after July 10, and that Shaffer had told him of the

**1368**

presence of two police officers in Remedio's office. (Tr. 536).

■ The evidence summarized above and the reasonable inferences arising therefrom provide an ample basis for the jury to rationally infer that Vespe and Shaffer willfully and knowingly conspired and agreed with each other to violate 18 U.S.C. § 1952(a)(3) by (a) traveling in interstate commerce between New Jersey and Delaware and (b) by using and causing to be used interstate telephone facilities with the intent to carry on the unlawful activity of extortion, viz., the obtaining of money from Remedio through threats of physical injury in violation of 11 Del.C. § 846(1) and (2) and without awaiting the outcome of litigation between Vespe and Remedio pending in the New Jersey state court.

It is quite clear that Vespe had no confidence of successfully recovering a judgment on his disputed claim against Remedio in the New Jersey state court litigation. He therefore retained the assistance of Shaffer, a man known to him to be dangerous, in order to force Remedio by threats of bodily harm to himself and his family to pay the large sums demanded. The interplay between Shaffer, the heavy-handed "gorilla" and "bad hombre" (TT V., p. 4, TT I., p. 9, Tr. 199, 246) and Vespe, the reasonable man who disliked violence, upon Remedio's will and nerves was too highly attuned and orchestrated both in timing and content of conversations not to have been agreed upon in advance. Vespe played upon Remedio's fear of Shaffer and reinforced it in every conversation. The enmeshing of the actions and conversations of Shaffer and Vespe with Remedio could have occurred only through full discussion and close cooperation between them in proceeding upon an overall scheme and plan to force Remedio to pay a substantial sum of money on a highly disputed claim which Vespe did not believe was legally collectable through pending court litigation. Therefore the defendant's motion for judgment of acquittal on the ground that there was insufficient evidence to show the existence of an agreement between Shaffer and Vespe to extort money from Remedio through threats of bodily injury will be denied.

### B. *Defendant's Conduct Was Not Within The Purpose Of 18 U.S.C. § 1952.*

■■ Defendant's second ground for judgment of acquittal is based on the argument that 18 U.S.C. § 1952 was intended exclusively to curtail unlawful activities of organized crime, and that, since no connection between the defendant and organized crime was either alleged or proved, defendant's conduct is not within the intendment of the Act. This argument is without merit. While it is true "that § 1952 was aimed primarily at organized crime," Rewis v. United States, 401 U.S. 808, 811, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), its chief focus is upon the use of the facilities of interstate commerce with the intent of furthering unlawful activities. "It is, in short, an effort to deny individuals who act for such a criminal purpose access to the channels of commerce." Erlenbaugh v. United States, 409 U.S. 239, 246, 93 S.Ct. 477, 482, 34 L.Ed.2d 446 (1972). In disposing of a similar argument advanced in United States v. Roselli, 432 F.2d 879, 885 (C.A. 9, 1970) cert. den. 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971), reh. den. 402 U.S. 924, 91 S.Ct. 1366, 28 L.Ed.2d 665 the Court stated:

"The words of section 1952 are general; they contain no restriction to particular persons or to particular kinds of gambling, liquor, narcotics, and prostitution offenses.

"The reasons seem self-evident. It would usually be difficult, if not impossible, to prove that an individual or business was associated with or controlled by a clandestine criminal organization. It might also be difficult to prove that a particular offense was of the kind commonly engaged in by organized criminals in 1961; and, in any event, such a restriction upon the

statute's coverage would provide an easy avenue for evasion through adoption of new forms and techniques of illicit trafficking. Nothing in the legislative history suggests that Congress intended prosecutors and courts to read into the Act such highly restrictive and administratively impractical exclusionary provisions. On the contrary, as we read the legislative record, Congress meant exactly what the language of section 1952 states—it deliberately chose to make the statute applicable generally, and without crippling restrictions, to any person engaged in any kind of illicit business enterprise in one of the four fields of activity specified in the statute, which experience showed to be those in which organized racketeers commonly engaged."

To the same effect is United States v. Colacurcio, 499 F.2d 1401, 1405 (C.A. 9, 1974); United States v. Mahler, 442 F. 2d 1172, 1175 (C.A. 9, 1971), cert. den. 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545; United States v. Isaacs, 347 F. Supp. 743, 753 (N.D.Ill.1972). Defendant's motion based on this ground will be denied.

## II. *MOTION FOR NEW TRIAL*

The defendant has advanced five different errors allegedly committed during the course of the defendant's trial, any one of which, defendant contends, entitles him to a new trial in the interest of justice. These alleged errors will be discussed *seriatim*.

### A. *Court's Instruction To Jury Relating to Conspiracy Was Error.*

Vespe first contends that the Court in ruling upon the admission of out-of-court statements of Shaffer, in effect, erroneously instructed the jury that if Shaffer's out-of-court statements were not later stricken, that the government had sustained its burden of proving that a conspiracy existed between Vespe and Shaffer.

■■ It is the general rule, as well as the rule of this Circuit, that the existence of a conspiracy and the defendant's connection therewith must be proved prima facie to the satisfaction of the Court before the declarations of one conspirator made in defendant's absence can be admitted against a conspirator defendant. United States v. DeLazo, 497 F.2d 1168, 1170 (C.A. 3, 1974). But declarations of one co-conspirator may be received at any time during the course of a trial subject to subsequent proof of the existence of the conspiracy and the connection of the defendant therewith. Esco Corporation v. United States, 340 F.2d 1000, 1008–9 (C.A. 9, 1965); United States v. Sansone, 231 F.2d 887, 893 (C.A. 2, 1956), cert. den. 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500.

During the early part of the trial when Remedio began to testify of statements made by the deceased Shaffer, the alleged co-conspirator of Vespe, Vespe's counsel objected to Shaffer's statements on the ground that before Shaffer's statements that were made out of Vespe's presence could be admitted and used against Vespe there had to be a showing to the Court that a conspiracy existed and that the defendant was connected therewith. (Tr. 117–118). Argument was heard on the objection out of the presence of the jury. (Tr. 117–119). While the Court was troubled with the prosecution's order of proof, it stated and warned the government while the jury was out as follows (Tr. 119–120):

"Well, the trouble I have, Mr. Thall— and you know that the general rule is that the existence of a conspiracy and the defendant's connection therewith must be proved at least prima facie to the satisfaction of the Court by creditable, independent evidence before declarations of one conspirator made in the defendant's absence can be received against the defendant.

"Now, I will admit that if independent facts and inferences drawn therefrom satisfy the Court that there was a likelihood of an illicit association, those declarations can be admitted,

**1370**

even though it may later eventuate that the independent evidence proves to be insufficient to justify submitting to the jury the question of the defendant's alleged guilty involvement with the declarant."

After this warning, the prosecutor made a plea in the interest of a clear presentation of the evidence to the jury that it should be unveiled in chronological order. The Court then replied (Tr. 121):

"Well, you are running a risk, and I am going to admit this evidence, but subject to being stricken and whatever else that I may do."

Upon the return of the jury to the courtroom, the Court warned the jury of the receipt of this evidence as follows (Tr. 121–122):

"Now, members of the jury: This is a conspiracy case and what has just been testified to is an alleged statement by a co-conspirator, Shaffer. You may not take into consideration —I have permitted this evidence to be admitted, subject to being stricken later if it is not proven by the Government that there was a conspiracy that existed between Mr. Vespe and Mr. Shaffer. If there was a conspiracy and that is proven by independent evidence, aside from any declarations made by Shaffer, then you may consider that evidence. But you cannot consider the evidence until the Government has proven that there was actually a conspiracy between Shaffer and Vespe, because a declaration of Shaffer could not be held against Vespe under the rules of evidence in a court of law in the United States.

"So I have admitted this evidence as to the declarations by Shaffer subject to the Government's proof that there was a conspiracy in existence between Shaffer and Vespe.

"All right. With that warning, keep in mind what this evidence is."

■ At the time of admitting Shaffer's declarations subject to subsequent

independent proof of the existence of the conspiracy and defendant's connection therewith in order to permit the evidence to be presented in chronological order, the Court was simply warning the jury that they could not consider such evidence until and unless they found a conspiracy to exist between Shaffer and Vespe. This was well within the trial Court's discretion. United States v. Bey, 437 F.2d 188, 190–191 (C.A. 3, 1971); Parente v. United States, 249 F. 2d 752, 754 (C.A. 9, 1957).

At the beginning of the third day of trial, before the jury entered the courtroom, the Court formalized its prior ruling (Tr. 119–121) by stating (Tr. 201–202):

"At the time the Government offered the declarations and statements of Mr. Shaffer through the testimony of Mr. Remedio and thereafter when Mr. Shaffer's statements on tapes which were recorded on July 12 and 22 were offered in evidence in this case, I admitted those statements subject to a motion to strike unless the Government proved prima facie through independent evidence the existence of a conspiracy and defendant's connection therewith.

"Now having heard the testimony of the Government's witnesses and Mr. Vespe's statements and conversations with Mr. Remedio contained on the tapes of July 12, July 15 and July 17 of 1974, the Court is now satisfied, upon viewing such evidence in total perspective and the reasonable inferences arising therefrom, that there has been a prima facie showing and a reasonable likelihood of an illicit association between Mr. Vespe and Mr. Shaffer, to the extent that Mr. Shaffer's declarations made in defendant's absence were properly received in evidence against the defendant, and that those statements will not be stricken from the record.

"Now, that is only the question as to the admissibility which I left in some doubt at the time that I made my ini-

tial ruling, and I am making this out of the hearing of the jury, of course." [9]

It should be noted that included in the preliminary instructions (Tr. 11–14) given to the jury at the beginning of the case was the warning: "After this case has been submitted to you, you must discuss the case only in the jury room when all members of the jury are present. You are to keep an open mind and you must not decide any issue in this case until the case is submitted to you for your deliberation under the instructions of the Court." (Tr. 14).

At the close of the trial, the Court gave lengthy and detailed final instructions to the jury regarding the nature of the conspiracy law, the manner in which it related to the instant case, and the essential elements of the conspiracy charged which the government was required to prove beyond a reasonable doubt. (Tr. 734–758). With respect to the statements of a co-conspirator, the Court specifically instructed the jury as follows (Tr. 743):

"In determining whether a conspiracy existed, the jury should consider the actions and declarations of all of the alleged participants. However, in determining whether a particular defendant was a member of the conspiracy, if any, the jury should consider only his acts and statements. He cannot be bound by the acts or declarations of other participants until it is established that a conspiracy existed, and that he was one of its members."

In addition, the Court further instructed (Tr. 747–748):

"Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed, and that a defendant was one of its members, then the statements thereafter knowingly made and the acts thereafter knowingly done, by any person likewise found to be a member, may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the statements and acts may have occurred in the absence and without the knowledge of the defendant, provided such statements and acts were knowingly made and done during the continuance of such conspiracy, and in furtherance of some object or purpose of the conspiracy.

"Otherwise, any admission or incriminatory statement made or act done outside of court, by one person, may not be considered as evidence against any person, who was not present and who did not hear the statement made, or see the act done.

"Therefore, statements of any conspirator, which are not in furtherance of the conspiracy, or made before its existence, or after its termination, may be considered as evidence only against the person who made them."

It is inconceivable that the jury was in any way confused by the warning given on the second day of trial regarding the conditional admission of evidence of Shaffer's declarations upon completion of the final instructions that were given just before the jury commenced its deliberations. Furthermore, the defendant has completely misinterpreted the warning given. The clear import of the warning was that Shaffer's statements were being admitted subject to proof by the government of the existence of the conspiracy and that until this was proved, Shaffer's statements could not be held against Vespe. The Court was required to make a finding at some point that a sufficient prima facie showing had been made as to the existence of a conspiracy *aliunde* of the challenged declarations to warrant

9. This ruling was in line with the holdings in United States v. Pordum, 451 F.2d 1015, 1017 (C.A.2, 1971), cert. den. 405 U.S. 998, 92 S.Ct. 1249, 31 L.Ed.2d 467 (1972); United States v. Geaney, 417 F.2d 1116, 1120 (C.A.2, 1969), cert. den. 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); Carbo v. United States, 314 F.2d 718, 735–737 (C. A.9, 1963), cert. den. 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964), reh. den. 377 U.S. 1010, 84 S.Ct. 1902, 12 L.Ed.2d 1058.

consideration of such declarations by the jury. This is exactly what the trial Court did. Rizzo v. United States, 304 F.2d 810, 826–827 (C.A. 8, 1962), cert. den. 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed. 2d 123. The Court finds no merit to defendant's first reason for a new trial.

### B. *Error In Admitting Tape Recordings Into Evidence.*

As a second ground for granting a new trial, the defendant contends that it was error to admit into evidence the electronically taped telephone conversations which occurred between Vespe and Remedio, and Shaffer and Remedio because the recording of such conversations violated Delaware state law. It is claimed that 11 Del.C. § 1335(4)[10] prohibits the interception of a telephone conversation unless the interception is made with the consent of both parties to the conversation, citing Commonwealth v. Murray, 423 Pa. 37, 223 A.2d 102 (1966). The defendant argues that the Delaware statute was patterned after the Pennsylvania statute construed in *Murray* and thus it is a valid precept of statutory construction that copying a statute of another state carries with it the adoption of the interpretations of the statute of the state from which it was adopted.

■ The Court finds no merit to this argument. First, the Murray case was distinguished in a later Pennsylvania case, Commonwealth v. Goldberg, 208 Pa.Super. 513, 224 A.2d 91 (1966), on the ground that *Murray* did not involve the interception by a subscriber on his own line. The *Goldberg* court held that a subscriber had a "paramount right" to make interception on his own telephone line. Remedio's interception in this case comes within the *Goldberg* rather than the *Murray* rule even if the Pennsylvania cases applied to the Delaware statute. Secondly, the Court is unconvinced that the Delaware statute was copied from

the Pennsylvania Act. The language of the two statutes is quite different and more importantly the commentary on § 1335 by the drafters of the Delaware Criminal Code stated: "Unauthorized wiretapping is contrary to federal law, but it is right that State law should also be on record against it." Del.Crim. Code with Commentary, 1973, p. 404. This statement suggests that the drafters of the Delaware statute were attempting to emulate the federal law, 47 U.S.C. § 605, which, of course, does not prohibit the recording of telephone conversations made with the consent of one party. United States v. Littman, 421 F.2d 981, 983 (C.A. 2, 1970), cert. den. 400 U.S. 991, 91 S.Ct. 448, 27 L.Ed.2d 438 (1971); United States v. Kaufer, 406 F.2d 550, 552 (C.A. 2, 1969) aff'd 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414, reh. den. 395 U.S. 917, 89 S.Ct. 1741, 23 L.Ed.2d 232; Harris v. United States, 400 F.2d 264, 267 (C.A. 5, 1968); Dryden v. United States, 391 F. 2d 214, 215 (C.A. 5, 1968); Parkhurst v. Kling, 249 F.Supp. 315, 316 (E.D.Pa. 1965), reconsidered 266 F.Supp. 780 (1967).

■ Despite all this, however, even if Delaware law were considered to have been violated, this fact would not render the taped recordings inadmissible in a federal criminal trial because federal and not state law provides the standard governing admissibility of evidence in a federal court. United States v. Johnson, 484 F.2d 165, 168 (C.A. 9, 1973), cert. den. 414 U.S. 1112, 94 S.Ct. 842, 38 L.Ed.2d 739; United States v. Escobedo, 430 F.2d 603, 607 (C.A. 7, 1970), cert. den. 402 U. S. 951, 91 S.Ct. 1632, 29 L.Ed.2d 122 (1971); United States v. Teller, 412 F. 2d 374, 377 (C.A. 7, 1969), cert. den. 402 U.S. 949, 91 S.Ct. 1603, 29 L.Ed.2d 118 (1971); United States v. Krol, 374 F.2d 776, 778 (C.A. 7, 1967), cert. den. 389 U.S. 835, 88 S.Ct. 46, 19 L.Ed.2d 97; United States v. Jones, 369 F.2d 217, 220 (C.A. 7, 1966), cert. den. 386 U.S.

---

10. 11 Del.C. § 1335 provides in part: "A person is guilty of violation of privacy when, except as authorized by law, he . . . .

(4) Intercepts without the consent of all parties thereto a message by telephone . . . including private conversations."

944, 87 S.Ct. 976, 17 L.Ed.2d 875 (1967); United States v. McGuire, 381 F.2d 306, 315 (C.A. 2, 1967), cert. den. 389 U.S. 1053, 88 S.Ct. 800, 19 L.Ed.2d 848 (1968); Ferguson v. United States, 307 F.2d 787, 789–790 (C.A. 10, 1962), opinion withdrawn and new trial granted on other grounds, 329 F.2d 923 (C.A. 10, 1964). Defendant's motion for a new trial based on its second ground will be denied.

### C. Admission of Co-conspirator's Hearsay Statements Violated Defendant's Sixth Amendment Right To Confront Witness.

█ Defendant's third ground for urging a new trial is that this Court erred in permitting Remedio to testify as to the content of Shaffer's unrecorded telephone threats made to Remedio on July 4 (Tr. 116–117) and July 12, 1974 (Tr. 129–134). The defendant argues that without this hearsay testimony the government could not prove that Remedio was instilled with the fear necessary to prove extortion as defined in 11 Del. C. § 846, and because this hearsay evidence was crucial to the government and devastating to the defendant, its admission violated Vespe's Sixth Amendment right to confront Shaffer. There is no merit to this contention.

Shaffer was an indicted co-conspirator with Vespe. He was shot to death after indictment but before trial. As set forth in detail under Point I of this opinion, there was ample evidence, putting aside the hearsay in question as required by Glasser v. United States, 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed. 680 (1942), from which the jury could find not only the existence of a conspiracy but also that Remedio was in mortal fear of bodily injury to himself and his family. For example, this fear is shown not only in the recorded conversations between himself, Vespe and Shaffer which took place on July 12, 15 and 22 but is also confirmed by the testimony of the police officers who interviewed Remedio (Tr. 72–74, 83) and by the fact that Remedio expended over $1,900

weekly to ensure off-duty police protection for himself and family. This corroborating evidence of Remedio's fear of physical injury affords sufficent "indicia of reliability" of Shaffer's hearsay threats to permit their admission in evidence. This is particularly so because the record is clear that the defendant was afforded full opportunity to cross-examine Remedio who testified to the dead co-conspirator's threats and also because Shaffer's threatening statements when uttered were admissions against his penal interest.

Finally, Vespe's contention that admitting into evidence Shaffer's threats through Remedio's testimony violated Vespe's Sixth Amendment right to confront Shaffer is also without merit. This argument and contention in a case factually similar to the present case was soundly and completely rejected by Judge Adams' excellent and explicit opinion in United States v. Weber, 437 F.2d 327, 336–340 (C.A. 3, 1970), cert. den. 402 U.S. 932, 91 S.Ct. 1524, 28 L. Ed.2d 867 (1971). In view of the Third Circuit opinion, this Court can add nothing further in rejecting defendant's third ground for a new trial.

### D. Prosecutor's Prejudicial Conduct.

During the first day of trial a subsidiary factual issue arose as to whether Shaffer arrived at Remedio's office on July 10 in the same chauffeur-driven automobile that Vespe later used in visiting Remedio's office on July 17. Detective Patton on direct examination testified that when he and Officer Landon approached Remedio's office on July 10, they "observed a 1974 black Cadillac limousine, with temporary registration tags, parked outside with a chauffeur, with a gentleman in a chauffeur's uniform behind the wheel." (Tr. 68). No questions were asked Patton during cross-examination regarding this testimony. The next witness to testify was Detective Landon who stated that upon arriving at Remedio's office on July 10, they noticed "a black limousine parked in a 'No Parking' area, and we took the tag

number down, driven by a chauffeur with a cap on." (Tr. 78). Landon on direct also indicated that he had followed Vespe's automobile from the [Delaware Memorial] bridge to Remedio's office on July 17. (Tr. 86). On cross-examination, Landon stated in response to defense counsel's questions that Vespe had traveled to Wilmington on July 17 in a car that was leased out of Philadelphia and that the car had Vespe's name written on it. (Tr. 90–91). Landon further testified, in response to defense counsel's questioning, that Shaffer had arrived at Remedio's office on July 10 in the same car or one that looked the same as the one that Vespe arrived in on July 17. (Tr. 91–92). Landon acknowledged that on July 10 the car had a temporary Pennsylvania license plate while on the 17th the automobile had a different license tag. (Tr. 92).

On redirect examination, in order to clarify Landon's testimony on cross-examination, the following questions and answers relating to the car were asked and given (Tr. 95–96):

Q. You have indicated twice on cross examination [11], Detective Landon, that you think the cars were the same because they had the same name. Could you explain what you mean "the same name"?

A. It was a black car, all black. It had Vespe's name wrote on it in red letters.

Q. On the side of the car?

A. Yes. With like a white circle around it.

Q. This was the car you observed with the temporary tags on the 10th as well as the car you observed on the 17th?

A. Yes.

It is clear that Detective Landon based his identification of the vehicles on what appeared to him to be Vespe's name printed in red letters within a white circle on the side of the limousine. (Tr. 92, 95–96).

Vespe denied that Shaffer was provided with Vespe's car to visit Remedio on July 10 (Tr. 517–519) and Vespe also testified that only his vehicle and no other company car had his name lettered on its side. (Tr. 519).

From the dispute as to whether Shaffer traveled to Remedio's office in a Vespe car on July 10, the defendant argues that the prosecutor must have known that the vehicles were of different ownership because the police officers recorded the registration number of the chauffeur-driven car observed at Remedio's office on July 10 and they must have checked its ownership. Thus, it is contended on the authority of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that when the government failed to place this information, which it must have known, in evidence, it withheld favorable evidence from the defense and denied the defendant a fair trial.

■ The Court finds no merit to this argument. First, this argument presupposes as proven facts that (1) Detectives Patton and Landon checked the number of the temporary license plate with the Pennsylvania authorities to determine ownership of the vehicle, and (2) that the information received as a result of that check showed the car not to to have been owned or leased by Vespe. The present record fails to support any such assumptions as to the actions of the police officers.

Secondly, there appears to have been no refusal to disclose or suppression of exculpatory evidence unknown to the defendant at time of trial. In *Brady*, supra at 87, 83 S.Ct. at 1197, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." In Moore v. Illinois, 408 U.S. 786, 794–5, 92 S.Ct. 2562, 2568, 33 L.

11. Tr. 91–92.

Ed.2d 706 (1972) reh. den. 409 U.S. 897, 93 S.Ct. 87, 34 L.Ed.2d 155, the Supreme Court in explaining *Brady* stated:

"The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or punishment."

▉▉▉ The underlying rationale of these cases is that an accused is denied a fair trial when items of favorable or exculpatory evidence unknown to him at the time of trial were not produced or were suppressed by the government. There is nothing in the present record, other than pure speculation, that the government failed to disclose or suppressed evidence of the ownership of the vehicle observed by the police officers at Remedio's office on July 10. Moreover, defense counsel was fully aware on the first day of trial by the testimony of Detectives Patton and Landon that they had recorded the temporary license plate of the car observed at Remedio's office on July 10. (Tr. 68, 78). No follow up of this testimony was undertaken by cross-examination of Patton. Indeed, when Landon was cross-examined by defense counsel, the following colloquy occurred (Tr. 92):

Q. What was the license number of the car that came there that Mr. Shaffer was in?

A. It was a Pennsylvania registration. I have it in my reports, but they are in the back of the room. The car Mr. Shaffer came in, it was the same car but had a temporary plate, a white plate, white cardboard with black lettering.

Q. You mean it was the same car or one that looked the same?

A. It looked the same.

Q. So it might not have been the same at all?

A. Well, it had the same name on it and it looked the same to me.

Thus, no request was made to examine the report or permit Landon to obtain his report which was in the courtroom to give the temporary license number even though defense counsel by his questions hinted the car might not have been the same.[12] There was not the slightest indication that the government would have objected either to showing Landon's report to the defense if it had been requested or to permitting Landon to use it to refresh his memory of the number of the temporary plate. Under these circumstances, this is not a *Brady* type situation where the existence of possible material evidence is unknown to the defendant at time of trial and is not disclosed by the government. Here the defendant was made aware that Landon had recorded the temporary plate number in his report which was present in the courtroom but failed to request the production of the report and failed to ask him whether he checked with the Pennsylvania authorities regarding the ownership of the vehicle. The Court concludes there was no suppression of material evidence unknown to defendant at trial and that the failure to pursue the matter, which was fully known to the defense early in the trial, was a tactical decision of the defense and was no fault of the government.

The defense has filed a post-trial affidavit of Alfred DiGiacomo[13] (Docket

---

12. Had defense counsel permitted Landon to refer to his report in order to give the number of the temporary Pennsylvania plate on the first day of trial, it would have been a simple matter for the defense to have checked with the Pennsylvania licensing authorities to determine the vehicle's registered ownership if the defense believed that to be important. The Supreme Court said in *Moore v. Illinois, supra* at 795, 92 S.Ct.

at 2568: "We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."

13. Remedio did not at first recognize DiGiacomo when he attended the July 10 meeting with Shaffer but then he was told by DiGiacomo that he had been on the Millville job as Vespe's foreman. (Tr. 125–127).

Item 44) which states that he accompanied Shaffer to Remedio's office on July 10 in a 1974 four-door black Cadillac sedan which was driven by Shaffer and not by a chauffeur, that Shaffer had "picked this automobile up from the Center City Cadillac Company a few days before July 10," that the car bore temporary tags, did not have Vespe's name printed on it but did have Shaffer's initials inscribed on its side. This, of course, is not newly discovered evidence because with due diligence it could have been presented at trial and moreover is simply cumulative of the defense testimony given by Vespe and by Harry Sadler, Vespe's private chauffeur, who testified that Vespe's vehicle was not used by Shaffer to visit Remedio on July 10. (Tr. 517–519, 627–630). In any event, this cumulative evidence does not appear to be very material considering all the other evidence in the case and it is not of such a nature that it would probably produce a different verdict if the case were retried. Defendant's motion for a new trial on these grounds will be denied.

### E. *Court Erred In Refusing To Permit Interviews Of The Jurors After Verdict.*

After the return of the verdict finding the defendant guilty as charged (Tr. 760–761), the jurors were individually polled upon defendant's application. (Tr. 761–762). Immediately thereafter, defense counsel made a special request "that the jury be polled as to whether they read or heard anything about this case since the trial started." (Tr. 762). The request was denied and the jury was dismissed. The Court denied the request because it was made after the verdict had been returned and there was nothing before the Court that would overcome the presumption that the jury had strictly followed the admonitions and instructions given each day not to read any publicity about the case. (Tr. 762–763).

At the beginning of the trial after voir dire of the jury panel (Tr. 5–10) and after the jury had been drawn and sworn (Tr. 10–11), the Court gave preliminary instructions which explained their duties and responsibilities. (Tr. 11–14). Among the instructions then given included the following (Tr. 12, 14):

"The law applicable to this case will be contained in the instructions I give you during the course of the trial, and it is your duty to follow all such instructions."

\*　　\*　　\*　　\*　　\*　　\*

"Until this case is submitted to you for your deliberation, you must not discuss this case with anyone or remain within hearing of anyone discussing it. Neither should you read any newspaper article, listen to any radio broadcast, nor view any television program which may discuss this case during the trial.

"After this case has been submitted to you, you must discuss this case only in the jury room when all members of the jury are present. You are to keep an open mind and you must not decide any issue in this case until the case is submitted to you for your deliberation under the instructions of the Court."

Because the jury was not sequestered, this admonition was repeated to the jury twice on each day of the trial every time the Court recessed for lunch and at the end of the trial day. (Tr. 47, 101, 164, 200, 272, 384, 449, 516, 590, 664–665). In the face of these clear and repetitive admonitions throughout the trial, it could not be presumed that the jurors had disregarded their duties and violated the instructions of the Court particularly when there was no suggestion of any wrongdoing at the time that the special request was made immediately after return of the verdict on October 22, 1974. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); United States v. Restaino, 405 F.2d 628, 630 (C.A. 3, 1969); Estes v. United States, 335 F.2d 609, 615 (C.A. 5, 1964) cert. den. 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559

(1965), reh. den. 380 U.S. 926, 85 S.Ct. 884, 13 L.Ed.2d 814; Rizzo v. United States, 304 F.2d 810, 815 (C.A. 8, 1962), cert. den. 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123.

Under date of December 12, 1974, the Court received a copy of a letter written by defense counsel to the Assistant United States Attorney who prosecuted the case. This letter advised that defense counsel had retained a private investigator to interview the jurors who sat on the trial of this case for the purpose of demonstrating to the Court defense counsels' personal belief that trial publicity had affected the jury's verdict. (Docket Item 36, EX B, p. 5). The Court on December 13, 1974 wrote to all counsel and set forth its concern for such an undertaking and outlined the risks involved. (Docket Item 36, EX B, pp. 3–4). As a result of this correspondence, defense counsel asked for and were granted a conference with the Court at which all counsel attended on December 17, 1974. (Docket Item 36, EX B, p. 1; Docket Item 38, p. 2). At the conference defense counsel stated that they wished to interview the members of the jury to determine whether they were influenced by newspaper publicity during the trial. The Court advised counsel to file a written motion and any supporting affidavits outlining what was proposed and what action it desired the Court to take. (Docket Item 38, p. 3). As a consequence, the defendant filed a motion and supporting affidavit of the defendant (Docket Item 37) on that day and oral argument was heard on December 18, 1974. (Docket Item 38).

The motion indicates that nine news stories appeared in the Morning News and Evening Journal papers published in Wilmington during the course of the trial in which reference was made to the "gangland style" slaying of defendant's co-conspirator, Shaffer, a "reputed mobster" with "extensive underworld contacts." (Docket Item 36, EX A). The motion, verified by the defendant, also stated: "During the course of the trial, at least one juror was observed carrying a copy of a newspaper into the jury box." (Docket Item 36, par. 2). Paragraph 4 of the motion continues:

"4. Counsel have retained the investigative firm of John J. Begley Associates to perform the subject investigation. Counsels' instructions to the investigative firm are:

(a) That each juror who is interviewed shall be notified that there is no compulsion on his part to discuss the matter with the investigator.

(b) Each juror who elects to cooperate will be asked whether or not during the course of the trial he obtained any information about the Defendant outside the Courtroom dealing with this case.

(c) If the answer to the above question is in the affirmative, the investigator will then inquire as to the source of any such information."

For the reasons set forth in open court (Docket Item 38, pp. 16–19), the defendant's motion was rejected and an order was entered that day denying the defendant "permission and approval of the Court to interview the trial jurors in the above captioned case." (Docket Item 37).

Thus, defendant's final ground for granting a new trial is based on the Court's failure to inquire of the jury after verdict whether they had read the news stories and the Court's later refusal to grant the defendant's private investigator permission to interview the jurors as sought in its December 18, 1974 motion.

Upon reconsideration of these matters, the Court reaffirms its original rulings denying the motions.

It was long the settled rule that counsel's communication with jurors after verdict regarding their conduct and deliberations was frowned upon. The compelling public policy behind this rule was to keep the jury room inviolate. The Supreme Court in addressing itself to this point in McDonald v. Pless, 238 U.S.

264, 267–268, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915) stated:

"But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference."

See also Rakes v. United States, 169 F. 2d 739, 746 (C.A. 4, 1948), cert. den. 335 U.S. 826, 69 S.Ct. 51, 93 L.Ed. 380; United States v. Schneiderman, 106 F. Supp. 906, 925–927 (S.D.Cal.1952). Indeed, the practice of interviewing a juror after trial as to his state of mind during trial is specifically disapproved in the Third Circuit. United States v. Hohn, 198 F.2d 934, 938 (C.A. 3, 1952), cert. den. 344 U.S. 913, 73 S.Ct. 336, 97 L.Ed. 704 (1953); United States v. Provenzano, 240 F.Supp. 393, 411–413 (D.N.J.1965), aff'd 353 F.2d 1011, cert. den. 384 U.S. 905, 86 S.Ct. 1340, 16 L. Ed.2d 358 (1966); United States v. El Rancho Adolphus Products, 140 F.Supp. 645, 653 (M.D.Pa.1956), aff'd 243 F.2d 367, cert. den. 353 U.S. 976, 77 S.Ct. 1058, 1 L.Ed.2d 1136 (1957), reh. den. 354 U.S. 927, 77 S.Ct. 1376, 1 L.Ed.2d 1441.

It is also persuasive that Delaware attorneys under The Delaware Lawyers Code of Professional Responsibility, Vol. 13, Del.Code Ann. (1970 Pocket Part), are advised in DR 7–108: "After discharge of the jury from further consideration of a case with which a lawyer was connected, the lawyer shall not ask questions of or make comments to a member of that jury."

If every disappointed defendant in a criminal case after a verdict of conviction is returned could undertake an investigation to fish around into either the mental attitude or conduct of jurors in the hope of turning up some misconduct, there would never be a finality to a case. It is as Justice Holmes wrote in Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910): "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day."

■ Now there is no doubt that there may be extraordinary circumstances, despite the policy considerations of freedom of deliberation, finality of verdict, and avoidance of jury tampering underlying the protection of the integrity of the jury system, which may induce a court to inquire into jurors' irregularity and misconduct by post-trial interview of the jurors. Mattox v. United States, 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892); United States v. Kum Seng Seo, 300 F.2d 623 (C.A. 3, 1962); United States v. Kohne, 358 F. Supp. 1046, 1051 (W.D.Pa.1973) aff'd 485 F.2d 682 (C.A. 3, 1974).

■ But post-trial interviewing of jurors that tends to harass, embarrass or frighten them or influence their conduct in future cases on which they may sit should be permitted with caution and great care and only upon a showing of substantial legal reason. Such interviews should never be granted on mere speculation or assumption of irregularity.

In this case the only reason advanced some seven weeks after the trial is a statement by the defendant that during the course of the trial he observed a juror carrying a copy of a newspaper into the jury box. No one else, including the Court, noticed any such incident and it is too speculative to presume even if this were observed by the defendant whether it was in fact a newspaper, or a local pa-

per at that, or that it was read by the juror. It can not be assumed that any of the jurors failed to heed the Court's repetitive warnings. Furthermore, if this incident was observed it was incumbent upon trial counsel to call this to the Court's attention at the time it occurred during trial and not wait until after verdict. If it had been raised when noticed, the Court would have had the opportunity to make a full inquiry and if necessary to have taken corrective action.

The Court thus concludes that a substantial legal reason has not been shown to require this Court in its discretion to grant the requested juror interviews after verdict. The Court further concludes that this contention is but an afterthought on defendant's part. The motion for a new trial on these grounds will be denied.

## ORDER

For the foregoing reasons, the defendant's motion for judgment of acquittal, defendant's motion for a new trial (Docket Item 40) and defendant's motion for an evidentiary hearing (Docket Item 46) are hereby denied.